UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                       :

WILLIAM I. KOCH, an individual,

                       :

                   Plaintiff,                07 Civ. 9600 (BSJ) (DF)

                       :

          -against-                  **REPORT AND**

                       :                **RECOMMENDATION**

ERIC GREENBERG, an individual,

                       :

                   Defendant.

-------------------------------------------------------------------X

**TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:**

       Currently before this Court are two separate sanctions motions (Dkts. 98 and 149), filed

by defendant Eric Greenberg ("Greenberg"), principally seeking, in turn:  (1) to preclude

plaintiff William I. Koch ("Koch") from using certain evidence in these proceedings because

Koch failed to maintain that evidence as confidential, as required by a Protective Order

previously issued by this Court, and (2) to dismiss Koch's claims because of his agents' alleged

falsification and spoliation of material evidence.

       For the reasons set forth below, I recommend that Greenberg's first sanctions motion

(Dkt. 98) be granted, and that Koch be precluded from introducing the evidence in question on

any substantive motion in this case or at trial.  I also recommend that Greenberg be awarded the

reasonable attorneys' fees and costs incurred as a result of Koch's violation of the Court's

Protective Order.  On the other hand, I recommend that Greenberg's second sanctions motion

(Dkt. 149) be denied.  While Koch's (or his agent's) apparent alteration of a document produced

in discovery was improper, the single incident that has been called to the Court's attention did

not result in prejudice to Greenberg and has not been shown to be indicative of a pattern of

fraudulent conduct that would warrant dismissal of Koch's claims.

## DISCUSSION

I.   **GREENBERG'S MOTION FOR SANCTIONS FOR
     KOCH'S VIOLATION OF THE PROTECTIVE ORDER**

   A.   **Background**

   Greenberg's first sanctions motion (Dkt. 98) primarily relates to Koch's unauthorized

disclosure of documents that had been produced to Koch by a third party, Fireman's Fund

Insurance Company ("Fireman's Fund"), pursuant to subpoena.  In this case, Koch alleges that

Greenberg knowingly sold him counterfeit wine; the Fireman's Fund documents are relevant to

Koch's claims to the extent that statements made by Greenberg in those documents (which relate

to an insurance claim filed by Greenberg) suggest that Greenberg may have believed that certain

wine in his collection was indeed counterfeit.  Although a Protective Order in this case (Dkt. 78)

prohibited parties from disclosing third-party-produced documents to anyone other than counsel

for 20 days, so as to allow the parties time to make confidentiality designations under that Order,

Koch, through his counsel, disclosed the Fireman's Fund documents to someone other than

counsel within one day of receiving them and before providing copies to Greenberg.  Moreover,

Koch's counsel had every reason to know that it was likely that, if afforded the opportunity,

Greenberg would have designated at least some of the documents as "Confidential" under the

Protective Order, given that certain of the documents had already been produced in the case by

another third party, and, at that time, had been so designated following negotiations in which

counsel for both Greenberg and Koch participated.

   Koch's violation of the Protective Order came to light when Koch's counsel wrote to

Greenberg's counsel a day after the disclosure, conceding the violation.  By that time, however,

the cat was well and truly out of the bag, as the person to whom Koch's counsel had disclosed

the documents in question – an officer of Koch's company, Oxbow Corporation ("Oxbow"),

named Brad Goldstein ("Goldstein") – was serving as Koch's press liaison at the time.

Goldstein, upon receiving the documents, *immediately* turned them over to a magazine reporter,

who later refused to return them and went on to refer to their contents in a published article. As

if this were not damaging enough, Goldstein also promptly turned the documents over to two

FBI agents, whom Koch was presumably urging to investigate his allegations against Greenberg.

    The facts relevant to this and additional violations of the Protective Order by Koch,

through his agents, are set forth in greater detail below.

### 1.    <u>Terms of the Protective Order</u>

    The Protective Order at issue was entered by this Court on August 7, 2009 (*see* Dkt. 78

("Protective Order")), after substantial negotiation of its terms by counsel.  Under the Protective

Order, the parties were permitted to designate as "Confidential" or "Confidential – Attorney's

Eyes Only" certain types of sensitive information produced in this litigation, including

information produced by non-parties pursuant to subpoena.  (*See id.*, at ¶ 2.)[1]  Information

designated as "Confidential" could only be disclosed to certain individuals, such as "parties to

this lawsuit, including current or former employees of a party to whom it [was] necessary that

the material be shown for the purposes of prosecuting or defending this lawsuit" (*id.*, at ¶ 4(a));

"Confidential – Attorney's Eyes Only" information could not be disclosed to anyone other than

counsel and retained experts in this action (*id.*, at ¶ 4(b)).  In order to enable the parties to have a

---

[1] "Confidential Information" is defined in the Protective Order as "trade secrets; proprietary, non-public, and competitively sensitive business information, such as customer lists and contracts; non-public financial information (whether personal or corporate); and personal identifying information."  (*Id.*)  "Attorney's Eyes Only Information" is defined as "highly sensitive 'Confidential Information,' that is reasonably likely to interfere with a person's business or personal affairs if seen by persons other than attorneys."  (*Id.*)

reasonable opportunity to review and make confidentiality designations with respect to any

documents produced by non-parties, the Protective Order provided that any party receiving such

documents would be required to apply the strict "Attorney's Eyes Only" restriction for 20 days

after receipt of the documents.  (*See id.*, at ¶ 3(d)(3).)[2]

### 2. Koch's Disclosure of the Fireman's Fund Documents to Goldstein and Goldstein's Immediate Disclosure of the Documents to the Press and the FBI

On April 26, 2010, Fireman's Fund produced 72 pages of documents to Koch's counsel,

in response to a subpoena served by Koch.  (*See* Declaration of Amy L. Hespenheide in Support

of Defendant Eric Greenberg's Motion to Enforce the Protective Order and for Sanctions, dated

Sept. 7, 2010 (Dkt. 100) ("9/7/10 Hespenheide Decl."), Ex. E.)  At least one of the documents,

an insurance application, was plainly eligible for confidentiality protection, as it contained the

social security numbers of Greenberg and Greenberg's wife.  (*See* Declaration of Bruce Wessel

in Support of Plaintiff's Opposition to Greenberg's Motion to Enforce the Protective Order and

for Sanctions, dated Oct. 8, 2010 (Dkt. 110) ("10/8/10 Wessel Decl."), Ex. A (certain of the

_____

[2] If a party disclosed confidential information to a person not authorized to receive it under the Protective Order, then the party was required by the Order to "immediately use its best efforts to protect such information." (*Id.*, at ¶ 9.)  In particular, the party responsible for the disclosure was required to "[r]equest[] that the person(s) to whom such information has been disclosed immediately return it to the disclosing party and agree to be bound to this Protective Order by signing an Acknowledgment Form," and "[p]romptly inform[] the party designating such information as 'Confidential' or 'Confidential – Attorneys' Eyes Only' and the parties to this lawsuit of the unauthorized or inadvertent disclosure and the identity of the person(s) to whom the disclosure was made." (*Id.*)

Fireman's Fund documents); 9/7/10 Hespenheide Decl., at ¶ 2; Koch Surreply,[3] at 1 n.1.)

Further, a subset of the documents, which had been produced earlier in the litigation by Royal

Wine Merchants, Ltd. ("Royal"), also in response to a subpoena, had been designated as

containing Confidential Information, after negotiation among counsel for Royal, Greenberg, and

Koch. (See 9/7/10 Hespenheide Decl., at ¶¶ 2-4; 10/8/10 Wessel Decl., at ¶ 5.)

Nonetheless, and despite the 20-day "hold" that the Protective Order required, one of

Koch's attorneys, Jared R. Gale, Esq. ("Gale") sent copies of documents to Goldstein, by email,

only one day after the documents had been produced by the Fireman's Fund.

(9/7/10 Hespenheide Decl., Ex. E.) The documents, as transmitted by Gale to Goldstein, were

not marked in any way as "confidential." (9/7/10 Hespenheide Decl., Ex. P (Declaration of Brad

Goldstein Regarding Documents and Protective Order, dated May 18, 2010) ("5/18/10 Goldstein

Decl."), at ¶ 11.) Records show that the unauthorized transmission occurred on April 27, 2010,

at 12:10 p.m. (See id.)

---

[3] As this Report and Recommendation addresses two separate sanctions motions, both filed by Greenberg, the Court has identified the parties' moving and opposition briefs as follows, for ease of reference:

(1)   As to Greenberg's first motion (Dkt. 98), the moving brief (Dkt. 102) is referred to herein as "Greenberg Mem. 1"; the opposition brief (Dkt. 108) is referred to herein as "Koch Opp. 1"; and the reply brief (Dkt. 113) is referred to herein as "Greenberg Reply 1." The parties' surreply briefs on this motion are referred to simply as "Greenberg Surreply" (Dkt. 197) and "Koch Surreply" (Dkt. 199).

(2)   As to Greenberg's second motion (Dkt. 149), the moving brief (Dkt. 150) is referred to herein as "Greenberg Mem. 2"; the opposition brief (Dkt. 171) is referred to herein as "Koch Opp. 2"; and the reply brief (Dkt. 175) is referred to herein as "Koch Reply 2."

The Court has received conflicting information regarding Goldstein's title and function within Oxbow at the time,[4] but it is clear that, among his duties, he acted as Koch's publicist. On April 27, at 12:18 p.m., just *eight minutes* after he received the documents from Gale, Goldstein emailed them to Michael Steinberger ("Steinberger"), a reporter for *Slate*, an online magazine. (5/18/10 Goldstein Decl., at ¶ 12.)  It was only after Goldstein had already forwarded the Fireman's Fund documents to Steinberger that Koch's counsel finally emailed the documents to counsel for Greenberg.  Documents show that this transmittal was on April 27, at 12:23 p.m. (9/7/10 Hespenheide Decl., Ex. C.)

Then, a mere half-hour later, at 12:53 p.m., Goldstein disclosed the Fireman's Fund documents, by email, to additional non-parties, this time to James Wynne ("Wynne") and Jeffrey Danik ("Danik"), who were both Special Agents with the Federal Bureau of Investigation ("FBI"); the documents were provided as an attachment to the email, and the email cover note itself disclosed the contents of certain of the documents.  (*Id.*, at ¶ 13.)  Further, Goldstein copied Jim Elroy ("Elroy"), whom Koch identifies as his litigation "consultant," on that email.  (*Id.*; *see*

---

[4] In a deposition given by Goldstein in another case, in June 25, 2009, Goldstein testified that his title, at that time and from the time he joined Oxbow, was "Director of Corporate Affairs."  (9/7/10 Hespenheide Decl., Ex. H, at 8.)  Similarly, in a declaration dated May 18, 2010, Greenberg again stated that his title was Director of Corporate Affairs.  (5/18/10 Goldstein Decl., at ¶ 1.)  On May 3, 2010, however, Oxbow's website identified Goldstein as "Corporate Communications Director."  (9/7/10 Hespenheide Decl., Ex. G.)  Koch contends the website information was "outdated" (Koch Opp. 1, at 6 n.3), but he offers no explanation as to when, prior to May 3, 2010, Goldstein may have held that different title.  Moreover, while Koch concedes that Goldstein has served as his "public relations advisor" (9/7/10 Hespenheide Decl., Ex. F, at 6), Koch also points to Goldstein's 2009 testimony that his job duties included "'working on matters relating to Mr. Koch's litigation involving his wine collection' . . . , lobbying, government affairs, and international involvement for Koch's companies" (Koch Opp. 1, at 6 (quoting Declaration of Bradley Leimkuhler in Support of Plaintiff's Opposition to Greenberg's Motion to Enforce the Protective Order and for Sanctions, dated Oct. 8, 2010 (Dkt. 109) ("10/8/10 Leimkuhler Decl."), Ex. A, at 9-10)).

*also* Supplemental Reply Declaration of Richard F. Munzinger in Support of Eric Greenberg's

Motion to Enforce the Protective Order and for Sanctions, dated Nov. 11, 2010 (Dkt. 198)

("11/11/10 Munzinger Decl."), Ex. A.)

### 3.   Koch's Admission of the Violation

On April 28, 2010, a day after the unauthorized disclosures to Goldstein (and, through

Goldstein, to Steinberger, the FBI, and Elroy), Koch's lead attorney on this case,

Edward M. Spiro, Esq. ("Spiro"), sent a letter to Greenberg's counsel, advising Greenberg of the

"inadvertent disclosure" of the Fireman's Fund documents the previous day.

(9/7/10 Hespenheide Decl., Ex. E.)  In particular, Spiro explained that the documents had been

"mistakenly provided to [Goldstein] prior to the expiration of the 20-day holding period

specified" in the Protective Order and that, in turn, "Mr. Goldstein, not realizing that the

document were subject to the 20-day holding period and not observing any confidential

designation marked on them, [had] shared the documents with a reporter from *Slate*, Michael

Steinberger." (*Id.*)  Spiro stated that, pursuant to the Protective Order, Koch had requested that

Goldstein return or destroy the documents and sign an acknowledgment agreeing to be bound by

the terms of the Protective Order.  (*Id.*)  Spiro also represented that Goldstein had requested that

Steinberger return the documents and sign an acknowledgment, but that Steinberger had declined

to do so.  (*Id.*)  Spiro did not mention the disclosure to the FBI or Elroy.  (*See id.*)

Also on April 28, 2010, Spiro, himself, sent a letter to Steinberger, requesting that the

Fireman's Fund documents be returned immediately and that Steinberger agree to be bound by

the Protective Order.  (10/8/10 Leimkuhler Decl., Ex. D.)  Spiro also sent a copy of that letter to

the General Counsel of the *Washington Post*, which owns *Slate*, as well as to counsel for

Greenberg.  (*See id.*)

On the following day, April 29, 2010, Arthur J. Shartsis ("Shartsis"), Greenberg's lead attorney on this case, responded to Spiro by letter, requesting that Koch provide further information regarding the disclosure of the Fireman's Fund documents, including the identity of anyone else to whom Goldstein had disclosed the documents, as well as the identity of every individual to whom any "confidential documents" in the litigation had been disclosed. (9/7/10 Hespenheide Decl., Ex. L.)  Also on April 29, Shartsis sent an email to Spiro, demanding that Goldstein, and any other representative of Koch, "immediately be instructed not to communicate in any way with any representative of any publication that has received documents that are protected by a confidentiality agreement or court order."  (9/7/10 Hespenheide Decl., Ex. M.)  Shartsis further demanded that, if there had already been any such communications since the disclosure of the Fireman's Fund documents to *Slate*, then Koch provide detailed information regarding those communications.  (*Id.*)  Finally, in a separate letter that day, Amy L. Hespenheide, Esq., another attorney for Greenberg, informed Koch's attorneys that Greenberg was designating the Fireman's Fund documents, under the Protective Order, as "Confidential – Attorney's Eyes Only Information."[5]  (9/7/10 Hespenheide Decl., Ex. D.)

By letter dated April 29, 2010, Spiro responded to the questions posed by Shartsis regarding the disclosure of the Fireman's Fund documents.  (9/7/10 Hespenheide Decl., Ex. N.) Spiro shared, for the first time, that Goldstein had emailed the documents to two FBI agents and Elroy.  (*Id.*)  Spiro stated that Goldstein had been directed not to communicate with anyone concerning the Fireman's Fund documents, but Spiro also stated that he would not agree to

---

[5] Much later, on December 2, 2010, Greenberg notified the Fireman's Fund of this designation, as well.  (*See* Declaration of Bradley Leimkuhler in Support of Koch's Surreply in Opposition to Defendant Greenberg's Motion for Sanctions, dated Dec. 23, 2010 (Dkt. 200) ("12/23/10 Leimkuhler Decl."), Ex. B.)

Shartsis's broader demand that Goldstein be prohibited from any communication on any topic with any representative of *Slate*. (*Id*.) Moreover, Spiro contended that Goldstein was "an employee of Mr. Koch," and, as such, Goldstein was permitted to receive materials designated as "Confidential Information" under the Protective Order. (*Id*.) Spiro did not explicitly indicate, though, whether Goldstein had received other materials covered by the Protective Order, in addition to the Fireman's Fund documents. (*Id*.) Finally, Spiro objected to Greenberg's designation of the Fireman's Fund documents as "Attorney's Eyes Only" information. (*Id*.)

On April 30, 2010, Spiro sent a letter to FBI Special Agents Wynne and Danik, requesting that they delete the Fireman's Fund documents and sign an acknowledgment agreeing to be bound by the terms of the Protective Order. (10/8/10 Leimkuhler Decl., Ex. E.) According to Koch's counsel, both of the FBI agents deleted – without reading – the email they received from Goldstein, along with the attached Fireman's Fund documents. (Koch Opp. 1, at 9 n.5.)

### 4.    The Court's May 3, 2010 Conference with Counsel

In a letter dated May 3, 2010, Shartsis informed the Court that Koch had violated the Protective Order and requested a conference to address potential interim relief. (*See* 9/7/10 Hespenheide Decl., Ex. F (Transcript of Hearing, held May 3, 2010) ("5/3/10 Tr.").) The Court held a telephonic conference that same day and expressed concern regarding the rapid disclosure of the Fireman's Fund documents by Koch's counsel to Goldstein, and then by Goldstein to the press and the FBI. (*See id*.) The Court specifically questioned Koch's counsel regarding Goldstein's role in the case and the reason why Goldstein, in particular, was receiving documents directly from counsel. (*See id*. at 6-8.)

At the conference, Spiro conceded that the disclosure of the Fireman's Fund documents to Goldstein and others had been a violation of the 20-day hold provision of the Protective Order. (*Id*. at 8-9.) Spiro argued more generally, however, that "Confidential Information" could be disclosed to Goldstein, under the provision of the Protective Order permitting disclosure to "employees of a party to whom it is necessary that the material be shown for the purposes of prosecuting or defending this lawsuit" (Protective Order, at ¶ 4(a)), and informed the Court that such disclosures had properly been made to Goldstein in the past, under that provision (*see* 5/3/10 Tr., at 11-15). Spiro acknowledged that Goldstein had never been personally employed by Koch, but contended that Goldstein qualified as Koch's employee because Goldstein "work[ed] directly for Mr. Koch at Oxbow . . . and Mr. Koch [was] the majority shareholder, the CEO, and control[led] Oxbow." (*Id*. at 14.) Moreover, Spiro argued that, although Goldstein served as a "public relations advisor" to Koch, Goldstein had also been "intimately involved during the course of Mr. Koch's various investigations into the wine industry and the problem of counterfeit wine." (*Id*. at 6.) Spiro argued that, as Goldstein was "very knowledgeable about the background of this case . . ., [he was] very helpful to counsel in sorting out various pieces of evidence." (*Id*. at 12.)

The Court expressed skepticism that Goldstein qualified as an "employee of a party" under the Protective Order, as Oxbow was not a party in this litigation and Koch had commenced the action in his personal capacity. (*Id*. at 15.) The Court directed Koch's counsel to recover from Goldstein all documents designated as containing "Confidential Information" and to instruct Goldstein that he was "not [to] talk to anyone outside of Mr. Koch and his counsel regarding any documents or material that [were] covered by the [Protective Order] in this case." (*Id*. at 18-19.) The Court further directed Koch to submit a sworn affidavit or a

10

declaration under penalty of perjury, by an individual with personal knowledge, identifying (a) "what documents were provided to Mr. Goldstein that would be covered by the Protective Order, meaning [that they were] confidential in any respect," (b) "when those documents were provided to him," (c) "whether he provided them to anyone else, and if so, when," and (d) "if he disclosed information that was in the documents, to whom he disclosed . . . the information, and if so, when." (*Id.* at 23.)

### 5.   Goldstein's May 18, 2010 Declaration

On May 18, 2010, Koch provided Greenberg with a declaration made by Goldstein under penalty of perjury. In that declaration, Goldstein stated that he was then serving as Oxbow's Director of Corporate Affairs. (5/18/10 Goldstein Decl., at ¶ 1.) Goldstein explained that he was paid by Oxbow, but that, when he worked on matters relating to wine, he allocated his time to a category designated for Koch's personal matters, and that he believed (although he did not have personal knowledge of this) that such time was ultimately charged through to Koch personally. (*See id.*)[6]

Separate and apart from the disclosure of the Fireman's Fund documents, Goldstein identified seven occasions, between August 2009 and March 2010, when Gale had provided him with copies of documents designated as containing "Confidential Information." (*Id.*, at ¶¶ 4-10.) According to Goldstein, to the best of his knowledge and recollection, he did not provide these documents, or confidential information contained in these documents, to any other non-parties. (*Id.*)

---

[6] No officer or employee of Oxbow with personal knowledge of how Goldstein was paid has ever confirmed that Goldstein's services were, in any part, personally compensated by Koch.

As to the Fireman's Fund documents, Goldstein explained that, "[c]oincidentally," he had just been speaking with Steinberger, on the same day that Gale forwarded him copies of the documents. (*Id.*, at ¶ 11.) According to Goldstein, he had been discussing with Steinberger the authenticity of certain vintages of wine sold by Greenberg to Koch, including a large format 1921 Petrus. (*See id.*) Goldstein purportedly learned from Steinberger, in their conversation, that Greenberg's publicist was maintaining that the large format 1921 Petrus was authentic and that Koch's position to the contrary was wrong. (*Id.*) Goldstein apparently wanted Steinberger to see the Fireman's Fund documents because, in Goldstein's view, the documents "showed that the position of Mr. Greenberg's publicist on the 1921 Petrus was inconsistent with the position [Greenberg] had taken with Fireman's Fund." (*Id.*)

Goldstein also stated in his declaration that, "[o]ther than the transmittal of the Fireman's Fund documents to Mr. Steinberger and the FBI agents and communications with Mr. Steinberger about them, [he did] not recall transmitting any information from any of [those] confidential documents . . ., except that[,] to the extent some of the information in the documents was generally known to [him] before the lawsuit was filed and as a result of [his] continuing work on counterfeit wine litigation, [he] may have discussed such general topics with third parties . . . ." (*Id.*, at ¶ 15.)

### 6.   The June 14, 2010 *Slate* Article

On June 14, 2010, *Slate* published an article by Steinberger entitled "What's in the Bottle?" (9/7/10 Hespenheide Decl., Ex. Q.) The article directly referred to and described the contents of the Fireman's Fund documents:

> Koch's complaint, which is still pending, asserts that Greenberg, a
> tech investor, bought certain . . . bottles [of wine] from Royal
> [Wine Merchants], and an insurance claim that Greenberg filed

12

appears to support this.  Koch obtained the claim earlier this year
after subpoenaing it from Fireman's Fund Insurance Company,
and his investigators shared it with *Slate*.  It shows that Greenberg
purchased $2.1 million worth of wine from Royal between
January 2000 and March 2002.

. . .

Greenberg filed his insurance claim in May 2002.  In it, he said
that Royal had sold him dozens of fake wines; by his tally,
fraudulent bottles accounted for $912,301 and possibly more of the
$2.1 million in wine that he had purchased from Royal during that
two-year period.  He provided Fireman's Fund with a list of wines
that he bought from Royal, and it included five magnums of
1921 Pétrus.  In November 2002, the insurance claim was denied
because Greenberg's [*sic*] wasn't covered against losses related to
fraudulent business transactions and his policy had also expired.

(*Id.* at 5-6.)  Elsewhere, the article referred to Goldstein as Koch's "spokesman."  (*Id.* at 6, 13.)

### 7.   Greenberg's Motion To Enforce the
### Protective Order and for Sanctions

On September 9, 2010, Greenberg moved to enforce the Protective Order and for

sanctions against Koch.  Specifically, Greenberg sought an Order (1) precluding Koch from

using the Fireman's Fund documents in this case; (2) awarding attorneys' fees and costs incurred

by Greenberg in connection with Koch's violations of the Protective Order; and (3) directing

Koch (a) to disclose any additional violations of the Protective Order, (b) to cease any further

disclosures to Goldstein of materials subject to the Protective Order, and (c) to instruct Goldstein

to return any such materials and to refrain from discussing or disclosing their contents with

anyone other than Koch and Koch's counsel.  (*See* Greenberg Mem. 1.)  Koch opposed

Greenberg's requests to preclude Koch's use of the Fireman's Fund documents and for

attorneys' fees and costs.  (Koch Opp. 1, at 2.)  With respect to the remaining relief requested by

Greenberg, Koch stated that there had not been any other violations of the Protective Order, that

13

Koch would no longer disclose to Goldstein information subject to the Protective Order, and that Goldstein had returned all materials subject to the Protective Order. (*Id.*) Given these representations, Greenberg, in his reply, focused only on his requests for preclusionary sanctions, fees, and costs. (*See* Greenberg Reply 1, at 10.)

### 8.   Goldstein's Deposition

After the sanctions motion was fully briefed, Greenberg deposed Goldstein. (11/11/10 Munzinger Decl., Ex. B (transcript of Goldstein deposition, taken Nov. 9, 2010).) At his deposition, Goldstein testified that, during the period of time in which he had regularly received documents containing Confidential Information, he had understood that – despite the Protective Order's directive that "Confidential" information could only be shared with certain current or former employees of a party to the lawsuit – he was permitted to share such information with law enforcement officials, if he believed the information related to criminal conduct. (*See* 11/11/10 Munzinger Decl., Ex. B, at 5.)

Moreover, notwithstanding the Court's subsequent ruling requiring that Goldstein be instructed "not [to] talk to anyone outside of Mr. Koch and his counsel regarding any documents or material that are covered by the [Protective Order] in this case" (5/3/10 Tr., at 18-19), at his deposition, Goldstein still seemed to believe that, under the terms of the Protective Order, he was permitted to share confidential information with law enforcement officials. (*See* 11/11/10 Munzinger Decl., Ex. B, at 5.) Specifically, after testifying that he believed that he had only violated the Protective Order once, by sending confidential documents to *Slate,* Goldstein went on to testify as follows:

14

Q.     What about the FBI?

A.     Well I didn't believe that to be a violation of the protective order.

Q.     You still don't believe it to be a violation?

A.     No, I don't.

. . .

Q.     So in your understanding as you sit here today, despite everything the judge in this case has said, it's perfectly fine for you to send confidential documents to government agents, correct?

       MR. SPIRO:   Object to form, assumes facts not in evidence, calls for a legal conclusion, misstates the witness's earlier testimony.

. . .

A.     Yes.

Q.     In fact, it's company policy to do so, correct?

A.     Yes.

(*Id.* at 5, 7-9.)

### 9.     The Parties' Surreply Submissions

On November 12, 2010, subsequent to Goldstein's deposition, Greenberg sought leave to file a supplemental reply brief, a copy of which he enclosed with his submission.  Greenberg argued that this supplemental reply was necessary because of Goldstein's testimony, quoted above, and also because Greenberg had just received a copy of the email that Goldstein had sent to the FBI agents, and had learned, through that production, that Goldstein had disclosed confidential information in the cover email itself, not just by attaching copies of the Fireman's Fund documents.  (Greenberg Surreply, at 2.)

15

With Greenberg's consent, Koch filed a responsive surreply on December 23, 2010, in

which he argued that a further review of the transcript of Goldstein's deposition showed that,

regardless of what Goldstein may have believed, his counsel had informed him that the

disclosure of confidential documents to the FBI was violative of the Protective Order. (*See*

Koch Surreply, at 7 n.4 (citing 11/11/10 Munzinger Decl., Ex. B, at 19-20).)  Koch also pointed

out his own deposition testimony to the effect that Oxbow did not have a policy of allowing its

employees to violate court orders. (*See id.* (citing 11/11/10 Munzinger Decl., Ex. C, at 283-85.)

In addition, Koch argued that the declaration provided by Goldstein in response to the Court's

Order was adequate, in that it confirmed Goldstein's disclosure of the Fireman's Fund

documents to the FBI agents, even if it did not mention that the documents were sent as

attachments to a cover email. (*See* Koch Surreply, at 6 (citing 5/18/10 Goldstein Decl., at ¶ 13,

and arguing that the cover email and the transmittal of attached documents constituted "one

event").)

This Court accepted and has considered the parties' surreply submissions.

## B.    **Appropriateness of Sanctions**

Rule 37 of the Federal Rules of Civil Procedure provides that "[i]f a party . . . fails to

obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a),

the court where the action is pending may issue further just orders."  Fed. R. Civ. P. 37(b)(2)(A).

By logical extension, this Court has consistently held that a protective order issued under

Rule 26(c) can be enforced through Rule 37(b). *See, e.g., Schiller v. City of New York*,

No. 04 Civ. 7921, 2007 WL 1623108, at *3 (S.D.N.Y. June 5, 2007) ("Discovery orders that can

be enforced through Rule 37(b) include protective orders issued under Federal Rule of Civil

16

Procedure 26(c).”); *Flaherty v. Filardi*, No. 03 Civ. 2167(LTS), 2009 WL 3762305, at *5

(S.D.N.Y. Nov. 10, 2009) (same).

Rule 37 provides for a range of permissible sanctions, one of which is the preclusive

sanction Greenberg seeks here – *i.e.,* a sanction “prohibiting the disobedient party . . . from

introducing designated matters in evidence.” Fed. R. Civ. P. 37(b)(2)(A)(ii), (vii). Sanctions

under Rule 37 are intended (1) to ensure that a party will not benefit from its failure to comply

with a court order, (2) to obtain the party’s compliance, and (3) to serve as a deterrent. *See*

*Update Art, Inc. v. Modiin Publ’g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (citing *Nat’l Hockey*

*League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976)). With these purposes in mind,

“Rule 37 permits the imposition of ‘just’ sanctions,” and thus “the severity of [the] sanction must

be commensurate with the non-compliance,” *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,

490 F.3d 130, 140 (2d Cir. 2007). “Severe sanctions are justified . . . when the failure to comply

with a court order is due to willfulness or bad faith, or is otherwise culpable,” *Daval Steel*

*Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991), but the Court’s discretion in

selecting an appropriate sanction should be guided by a number of factors, including: “(1) the

willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser

sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant

party had been warned of the consequences of his noncompliance,” *Nieves v. City of New York*,

208 F.R.D. 531, 535 (S.D.N.Y. 2002) (citing *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d

849, 852-54 (2d Cir.1995)).[7]

---

[7] Aside from Rule 37, the Court also has inherent authority to sanction a party for its failure to comply with a protective order. *See Schiller*, 2007 WL 1623108, at *3. In particular, under its inherent authority, the Court may impose contempt sanctions for a violation of its order, “if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the

Here, Koch concedes a violation of the Protective Order and offers no persuasive argument to avoid the imposition of Rule 37 sanctions.  Further, a significant sanction is warranted, based on the factors set out above and the following facts, which the Court finds to have been amply demonstrated by the record:

(1)    Upon receiving, pursuant to subpoena, Fireman's Fund documents that were supposed to be treated as "Attorneys' Eyes Only," Koch's counsel almost immediately disclosed the documents to an individual who was not Koch's attorney and thus was not entitled to view them under the terms of the Court's Order.

(2)    This unauthorized disclosure by counsel was made despite the fact that counsel had engaged in substantial negotiation of the Protective Order, prior to its issuance by the Court, and were thus well aware of its terms.

(3)    The unauthorized disclosure was further made despite the fact that, based on previous designations of the exact same documents, Koch's counsel had every reason to know that Greenberg would be likely to designate the Fireman's Fund documents "Confidential," in whole or in part.

(4)    The specific individual to whom counsel disclosed the documents – Goldstein – was not just anyone working on the case, but rather was Koch's *publicist*;

(5)    Given (a) Goldstein's employment by Oxbow, and (b) his apparently non-essential role in the actual prosecution of this litigation, counsel could have had no good faith basis for believing that Goldstein was entitled to view any

---

proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir.2004) (internal quotations and citations omitted).  "[C]ivil contempt sanction[s] may. . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance," *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989), but may not be purely punitive, *Sunbeam Corp. v. Golden Rule Appliance Co.*, 252 F.2d 467, 469 (2d Cir. 1958) (citing *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947)).

documents designated as "Confidential," much less documents that were supposed to be held as "Attorneys' Eyes Only."[8]

(6)     Even if counsel wrongly believed that Goldstein was entitled to view confidential documents, counsel knew of Goldstein's role as Koch's press liaison, and thus should have exercised particular care to ensure that Goldstein understood the terms of the Protective Order.

(7)     Based on his deposition testimony, Goldstein had (and continued to have, even by the date of his deposition) a fundamental misunderstanding of the Protective Order's requirements.

(8)     Upon receiving confidential documents from counsel, Goldstein immediately turned them over to a magazine reporter, as well as to government investigators.

(9)     The documents were disclosed both to Goldstein and, through Goldstein, to the press, before Greenberg was even made aware by Koch's counsel that the documents had been obtained pursuant to subpoena.

(10)    When Koch's counsel then informed Greenberg of Goldstein's disclosure of Fireman's Fund documents to the press, counsel did not similarly mention that disclosures had also been made to the FBI and Elroy.

(11)    The disclosure of the Fireman's Fund documents to Goldstein was not an isolated incident, as Koch's counsel had made unauthorized disclosures to Goldstein on several prior occasions, without any notice to Greenberg.

---

[8] To the extent Goldstein was an employee of Oxbow, he was plainly not an "employee[]" of a party" under paragraph 4(a) of the Protective Order (*see supra* at 3), and Goldstein's suggestion that he may have been paid personally by Koch for certain services (5/18/10 Goldstein Decl., at ¶ 1) is without any competent support in the record presented. Further, by merely asserting that Goldstein was knowledgeable about the "background" of this case (5/3/10 Tr., at 12) and that, through assisting Koch with his investigation, Goldstein had obtained some of the information that was then used by Koch in this litigation (*see* 5/18/10 Goldstein Decl., at ¶ 2), Koch has not shown that Goldstein was a person "to whom it [was] *necessary* that [confidential] material be shown for the purposes of prosecuting . . . this lawsuit." (Protective Order, at ¶ 4(a) (emphasis added).)

19

When this matter was first brought to this Court's attention, the Court indicated that it was troubled by the alarming alacrity with which Koch's counsel disclosed the Fireman's Fund documents to Goldstein, and the even greater alacrity with which Goldstein then disclosed them to the press. The Court had difficulty comprehending then, and still fails to comprehend now, why, seemingly as a matter of course, counsel had engaged in the practice of forwarding confidential material to Koch's publicist. Even if counsel's particular disclosure of the Fireman's Fund documents to Goldstein was an unwitting error, counsel's conduct shows, at a minimum, that counsel likely had few, if any, procedures in place to try to ensure that such unauthorized disclosures did not occur. Further, the fact that multiple unauthorized disclosures to Goldstein had previously taken place demonstrates that Koch's counsel never made any serious effort to ascertain whether Goldstein was actually authorized to receive confidential documents. Given Goldstein's role as press liaison, the question of the propriety of his access to confidential information should have received particular scrutiny, not neglect.

Considering counsel's conduct as a whole, as outlined above, the Court concludes, first, that the disclosure of the Fireman's Fund documents to the public was the direct result of Koch's attorneys' willful disregard of their obligations under the Protective Order entered by the Court. Second, in light of the facts presented here, the Court cannot see how any lesser sanction than the preclusive sanction sought by Greenberg would adequately deter Koch and his counsel from further violations of the Order. No lesser sanction has been suggested by Koch, and, certainly, a monetary sanction here would likely have little significant impact, given the high litigation costs that Koch has already incurred. Third, with respect to the duration of Koch's non-compliance, the disclosure of the Fireman's Fund documents was apparently only the latest of several violations, over an extended period of time. Finally, while the Court did not explicitly warn

20

Koch that a violation of the Protective Order could result in preclusive sanctions, Koch engaged experienced counsel to represent him in this action, and counsel would have been aware that violations of an Order could result in severe sanctions.  Moreover, in the context of disclosure of confidential information in violation of a Rule 26(c) protective order, the damage is done upon the act of disclosure, and "[p]arties and counsel have no absolute entitlement to be 'warned' that they disobey court orders at their peril."  *Daval Steel*, 951 F.2d at 1366.

"[A]lthough preclusion of evidence and dismissal of the action are harsh remedies and should be imposed only in rare situations, they are necessary to achieve the purpose of Rule 37 as a credible deterrent 'rather than a 'paper tiger.''"  *Update Art, Inc. v. Modiin Pub, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979) (internal citation omitted)).  Koch's argument that preclusion would be too harsh a sanction because the Fireman's Fund documents are particularly prejudicial to Greenberg (*see* Koch Opp. 1, at 17 (arguing that the documents are "highly probative of a key issue in the case . . . [as they] tend to show that Greenberg believed he was sold counterfeit wine by Royal")) is not persuasive.  The more Koch's counsel believed that the documents were potentially damaging to Greenberg and his reputation, the more careful they should have been about disclosing the documents to Goldstein, as, given his function, it was foreseeable that sharing documents with him would result in the documents being made public.  The value of a protective order would diminish if litigants believed that, the more damaging the documents disclosed, the less likely it would be that a preclusive sanction would result.  In any event, Koch does not contend that the Fireman's Fund documents are necessary to prove his claims.

Koch's additional arguments against preclusion are also flawed.  His suggestion that the most "relevant" of the Fireman's Fund documents do not actually warrant confidentiality protection (*see* Koch Opp. 1, at 19-20) is beside the point.  Even if Greenberg has been overly aggressive in his confidentiality designations, the structure of the Protective Order was designed to afford the parties a reasonable opportunity to make such designations, and Greenberg was wholly deprived of that opportunity here.  *See Schiller*, 2007 WL 1623108, at *3 (explaining that "the need for relief" following the disclosure of documents in violation of a protective order, had not "been diminished" by the court's determination that those documents did not qualify to be designated as confidential, as "the utility of protective orders depends on the court's ability to enforce them").  Finally, to the extent Koch suggests that he should not be sanctioned because he was not "personally involved in any" of the violations of the Court's Protective Order (Koch Surreply, at 1), Koch misapprehends the law.  Not only is it the Court's understanding that Koch has been personally involved in virtually all aspects of this litigation, but, in any event, "[i]t has long been the law in this Circuit that a client may be sanctioned for his lawyer's misconduct," *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union,* No. 00 Civ. 3613 (LAP), 2004 WL 1943099, at *25 (S.D.N.Y. Aug. 27, 2004) (citing *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068 (2d Cir. 1979)).

Under all of the circumstances presented, preclusion of the Fireman's Fund documents is warranted under Rule 37, as is an award of the attorney's fees and costs incurred by Greenberg as a result of Koch's failure comply with the Court's Order.  The Rule dictates that such fees and costs be awarded, unless the violation in issue was substantially justified or the award would otherwise be "unjust," *see* Fed. R. Civ. P. 37(b)(2)(C), and nothing in the record presented here

suggests that the conduct of Koch's counsel was either justified or that a fee award would be

unjust.  Accordingly, I hereby recommend that (1) Koch be precluded from introducing the

Fireman's Fund documents either on any substantive motion in this case or at trial, and (2) Koch

be directed to pay Greenberg's reasonable attorneys' fees and costs incurred in connection with

the violations of the Protective Order discussed above, including the fees and costs incurred in

making the sanctions motion.[9]

## II.   GREENBERG'S MOTION FOR SANCTIONS FOR KOCH'S SPOLIATION OF EVIDENCE

### A.   Background

Greenberg's second sanction motion (Dkt. 149) is primarily based on the fact that Koch's

consultant, Elroy, apparently created two versions of a memorandum that each purported to

quote, in their entirety, a letter from Elroy to a representative of a wine chateau in France and an

email in response from the chateau representative – but the quoted letter from Elroy differed in

the two memoranda, thus suggesting that, in one of the versions, Elroy had deliberately altered

the substance of his actual letter, rendering the quoted email response misleading.  It further

appears Koch's expert was provided with only one version of the memoranda – the version that

suggested a response by the chateau that was more favorable to Koch's position in this lawsuit –

and that the expert then relied on that (potentially false) version to support his opinion that the

wine in question was counterfeit.

Greenberg argues that Koch or his agent materially falsified evidence and that this

conduct, combined with Koch's failures (1) to produce the actual underlying correspondence at

---

[9] As the Court has determined that the sanctions requested by Greenberg are appropriately imposed under Rule 37, the Court need not go on to determine whether such sanctions would also be appropriate under the Court's inherent authority.

issue, (2) to preserve the handwritten notes of Elroy's meeting with the chateau representative (and of other, similar meetings between Koch investigators and chateau representatives), and (3) to produce videotapes of such meetings in a timely fashion, justify case-dispositive sanctions. (*See generally* Greenberg Mem. 2.)

The facts relevant to Greenberg's motion, seeking sanctions for spoliation of evidence, are as follows:

1.     **The Two Versions of the Elroy Memorandum**

    a.     **The Difference Between the Two Versions**

Elroy operates a company that provides investigative services and, since 1995, he has worked exclusively for Koch and Oxbow in connection with Koch's investigation of counterfeiting in the wine industry. (*See* Declaration of Frank A. Cialone in Support of Defendant Eric Greenberg's Motion for Sanctions for Spoliation of Evidence, dated Feb. 7, 2011 (Dkt. 152) ("2/7/11 Cialone Decl."), Ex. F (Deposition of Jim Elroy, taken Nov. 11, 2010), at 6-7.) In March 2006, on Koch's behalf, Elroy met with Jean-Claude Berrouet ("Berrouet"), of Chateau Petrus, to discuss alleged fraud in the industry and, in particular, the authenticity of certain magnums of 1921 Petrus. (*See id.* at 40.) According to Elroy, he brought two full magnums and one empty magnum of 1921 Petrus to the meeting. (*Id.* at 65-66.) Elroy also contends that, shortly after this meeting, he sent a letter to Berrouet (as an email attachment), setting forth Elroy's recollection of the opinions Berrouet had shared and requesting that Berrouet confirm those opinions. (*Id.* at 47-49.) Elroy testified that Berrouet responded by e-mail, in French, confirming all of the opinions set forth in Elory's letter. (*Id.* at 50.) Elroy further testified that he had an English translation of Berrouet's email prepared by someone at Oxbow. (*Id.* at 52-53.)

Over the course of discovery, Koch has produced two different versions of a memorandum by Elroy, which appear to set forth copies of the correspondence between Elroy and Berrouet. (*See* 2/7/11 Cialone Decl., Exs. I, J.) The two versions of the memorandum are nearly identical. Both begin with the supposed text of the letter from Elroy to Berrouet, requesting that Berrouet:

> confirm the opinion and findings of you and your staff concerning two bottles of 1921 Petrus that were examined by you in France. It was your opinion and the opinion of your staff that the two bottles we presented were not authentic bottles of 1921 Petrus wine.

(*Id.*) The Elroy letter then enumerates several reasons that allegedly formed the basis of that opinion. (*Id.*) In both versions of the memorandum, the supposed text of Elroy's letter is followed immediately by what appears to be the text of an email response, in French, dated March 27, 2006 at 10:19:21 p.m., from the email address "berrouet@jpmoueix.com." (*Id.*) Following the text of the email is a purported "[t]ranslation," which states, in relevant part, that "[a]ll of your communications are true." (*Id.*)

The only difference between the two versions of the memorandum is the text of Elroy's letter, in the last of the enumerated reasons allegedly forming the basis of Berrouet's opinion that the two bottles presented by Elroy were not authentic. In the first version, the letter concludes by stating:

> The cork is too long and in fact you advised, 'I have never seen a cork that long in any Petrus bottle.'

(2/7/11 Cialone Decl., Ex. I.) In the second version, however, the letter concludes with:

> The cork is too long and in fact you advised, 'I have never seen a cork that long in any Petrus bottle.' Until now you have never observed a 1921 Petrus magnum and never heard of such a bottle. All of the above causes you to believe the bottle is a forgery.

(2/7/11 Cialone Decl., Ex. J.)  Thus, from the second version of the memorandum, it would appear that Berrouet had expressly confirmed that he was not aware of any 1921 Petrus in magnum format and that, in his opinion, the bottle in question was counterfeit.

### b.   Lack of Production of the Actual Elroy Letter

It is unclear which version, if either, of Elroy's letter was actually sent to Berrouet, as there is no evidence of the communications between Elroy and Berrouet, other than the two versions of Elroy memorandum.  Greenberg requested that Koch produce the actual email exchange between Elroy and Berrouet (and between Elroy and Oxbow, to obtain the English translation of Berrouet's response), but Koch has not done so.  (*See* 2/7/11 Cialone Decl., Ex. K.) Further, Elroy has testified that he uses an AOL service for his work-related email and that, pursuant AOL's data retention policies, the emails themselves no longer exist.  (*See* Declaration of Bradley Leimkuhler in Support of Plaintiff's Opposition to Greenberg's Motion to Enforce the Protective Order and for Sanctions, dated Mar. 10, 2011 (Dkt. 172) ("3/10/11 Leimkuhler Decl."),[10] Ex. M (Deposition of Jim Elroy, taken Nov. 11, 2010), at 57-58.)  Koch does not appear to have offered any explanation as to why the communications with the Oxbow employee who translated Berrouet's email have not been produced, and neither of the parties has contacted Berrouet to request any records he may have or to assess his recollection of these events.

---

[10] Although titled "Declaration of Bradley Leimkuhler in Support of Plaintiff's Opposition to Greenberg's Motion to Enforce the Protective Order and for Sanctions," this declaration appears to be in support of Koch's opposition to Greenberg's motion for sanctions for spoliation.

### c.   Reliance of Koch's Expert on the
### Second Version of the Memorandum

In a report dated November 1, 2008, William Edgerton ("Edgerton") – who was, at that

time, designated by Koch as a testifying expert – relied, in part, on the second version of the

Elroy memorandum in concluding that a particular magnum of 1928 Petrus was counterfeit.

(2/7/11 Cialone Decl., Ex. N, at 166; Ex. H, at 262-64.)  At Edgerton's deposition on

April 15, 2010, counsel for Greenberg confronted Edgerton with the first version of the Elroy

memorandum.  (2/7/11 Cialone Decl., Ex. H, at 333-36.)  Edgerton testified that he had never

seen the first version, but that it did not change his conclusions.  (*Id.* at 335-36.)

Koch has since withdrawn his designation of Edgerton as a testifying witness and it does

not appear that Koch or any of Koch's other experts have relied – or intend to rely – on either

version of the Elroy memo.

### d.   Koch's Lack of Explanation for the Two Versions

Since Edgerton's deposition, Koch has failed to provide any meaningful (or consistent)

explanation for the fact that there are two versions of the Elroy memorandum.  In briefing on his

motion for leave to amend the Complaint to add allegations regarding additional bottles of

allegedly counterfeit wine, Koch argued that both versions of the Elroy memorandum were

"drafts."  (Reply Memorandum of Law in Further Support of Plaintiff's Motion for Leave to

Amend the Complaint, dated July 6, 2010 (Dkt. 94), at 2.)  Yet, less than two weeks later, in his

request for relief following the default of a defendant in a related case also pending before this

Court, Koch's counsel submitted the first version of Elroy memorandum, describing it as a "true

and correct copy of a March 13, 2006 memorandum prepared by Jim Elroy," with no mention of

the document being a "draft" or any reference to a second version.  (*See* Affidavit of Bruce A.

27

Wessel, dated July 15, 2010, submitted in *Koch v. Rodenstock,* No. 06 Civ. 6586 (BSJ) (DF) (Dkt. 86-1), at ¶ 13.)

Now, in his opposition to Greenberg's sanctions motion, Koch sidesteps the issue altogether, and simply argues that both versions of the Elroy memo are "accurate" accounts of the opinions expressed by Berrouet at the March 2006 meeting, based on other accounts of that meeting. (Koch Opp. 2, at 3-4, 9-11; *see also* 3/10/11 Leimkuhler Decl., Ex. J (email by Melissa McCormick, Esq., an attorney for Koch who also attended the meeting, stating that Berrouet and the Petrus cellar-master "both said that before seeing [Koch's] two bottles a year ago, they had never heard of a 1921 Petrus magnum and do not believe Petrus bottled any magnums of 1921.").)

### 2.   Destruction of Handwritten Notes of Investigator Meetings

While investigating the wine industry on Koch's behalf, Elroy, as well as Goldstein, met with representatives from several chateaux and other individuals involved in that industry. During those meetings, Elroy and Goldstein often took handwritten notes, which were then used to prepare memoranda summarizing the meetings. (*See* Greenberg Mem. 2, at 13; Koch Opp. 2, at 4.) It is unclear whether Elroy would have had notes of his meeting with Berrouet, but both Elroy and Goldstein testified that they routinely destroyed their handwritten notes after preparing those memoranda. (*See* 2/7/11 Cialone Decl., Ex. B, at 48-49, Ex. H, at 165-66.)

### 3.   Delayed Production of Videotapes of Meetings

Portions of at least some of the meetings between Koch's agents and chateau representatives were also apparently videotaped. (*See* Reply Declaration of Frank A. Cialone in Further Support of Motion for Sanctions for Spoliation of Evidence, dated Mar. 29, 2011 (Dkt. 176) ("3/29/11 Cialone Decl."), Ex. G (Deposition of Jim Elroy, taken Nov. 11, 2010),

at 38-39.)  On April 7, 2010, Greenberg's counsel sent a letter to the Court, complaining that, among other things, Koch had failed to produce those videotapes.  (*See* Letter from Arthur J. Shartsis, Esq. to the Court, dated April 7, 2010.)  In a letter to the Court later that day, Koch's counsel represented:  "Koch is willing to produce [the videotapes] and is currently gathering and preparing them for production."  (2/7/11 Cialone Decl., Ex. M, at 2.)  At a telephonic conference the following day, the Court suggested that Greenberg wait for Koch to make this agreed production and to return to the Court if issues regarding this discovery then remained.

It now appears that, in April 2010, when Koch's counsel indicated that the videotapes were being "gather[ed] and prepar[ed] for production," Koch's counsel did not yet have possession of them (*see* Koch Opp. 2, at 4), although the question of who, at that time, had possession of the tapes is not entirely clear.[11]  Further, it is undisputed that, even 10 months later, when Greenberg filed his motion for sanctions for spoliation, Koch had still not produced the videotapes.  Yet, instead of inquiring of Koch's counsel as to why the videotapes had not been produced or returning to the Court to seek the entry of an order compelling production, Greenberg concluded that the videotapes must have been destroyed.  (*See* Greenberg Mem. 2, at 13 ("These facts compel the conclusion that *Koch or his agents destroyed the videos*.") (emphasis in original).)  This assumption by Greenberg was apparently erroneous, as Koch responded to Greenberg's accusation by finally producing the videotapes.  (*See* Greenberg Reply 2, at 6.)

---

[11] *Compare* 2/7/11 Cialone Decl., Ex. G, at 38-39 (deposition testimony by Elroy that Koch's U.S. counsel had kept the videotapes), *with* Koch Opp. 2, at 4 (suggesting that the videotapes had been held in France).

### B.   Appropriateness of Sanctions

"Spoliation of evidence occurs when a party or an agent of such party destroys or significantly alters evidence, or fails to properly preserve it for another's use as evidence in a pending or reasonabl[y] foreseeable litigation." *Alaimo v. Trans World Airlines, Inc.*, No. 00 Civ. 3906 (GBD), 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)).  Rule 37(b) of the Federal Rules of Civil Procedure provides that a court may impose sanctions for spoliation in violation of a discovery order.  *See Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002).  Absent a court order (as is the situation presented here), a court may sanction a party for spoliation pursuant to "its inherent power to manage its own affairs."  *Id.*

The threshold question when considering sanctions for the destruction of evidence is whether the party who destroyed the evidence had any obligation to preserve it, as where "the party should have known that the evidence may be relevant to future litigation." *Kronish v. United States*, 150 F.3d 112, 127 (2d Cir. 1998); *see also Remee Prods. Corp. v. Sho-Me Power Elec. Co-op*, No. 01 Civ. 5554 (HB), 2002 WL 31323827, at *8 (S.D.N.Y. Oct. 17, 2002).  Once it has been demonstrated that evidence has been destroyed by a party with an obligation to preserve it, the Court "must proceed to consider (1) the degree of fault of the party who destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) the appropriate sanction." *Remee Prods. Corp.*, 2002 WL 31323827, at *8 (internal quotation marks and citation omitted).  Fault is to be examined on a case-by-case basis, and, under some circumstances, ordinary negligence may be sufficient to warrant a sanction. *See Residential Funding Corp.*, 306 F.3d at 101.  As for prejudice, the Court "must determine 'whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party

30

affected by its destruction.'" *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-08 (2d Cir. 2001)

(quoting *Kronisch v. United States,* 150 F.3d 112, 127 (2d Cir. 1998), *cert. denied*, 531 U.S.

1078 (2001)).

 Where spoliation of evidence is found to be sanctionable, the court will have "broad

discretion in crafting a proper sanction," and it "should be molded to serve the prophylactic,

punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779

(citation omitted).  A wide range of sanctions may be available, including "ordering dismissal of

the culpable party's suit, granting summary judgment in favor of the prejudiced party, precluding

the culpable party from giving testimony regarding the destroyed evidence, or giving an adverse

inference instruction to the jury against the culpable party." *Rutgerswerke AG & Frendo,*

*S.p.A. v. Abex Corp.*, No. 93 Civ. 2914, 2002 WL 1203836, at *12 (S.D.N.Y. June 4, 2002).

"The sanction should be designed to:  (1) deter parties from engaging in spoliation; (2) place the

risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the

prejudiced party to the same position he would have been in absent the wrongful destruction of

evidence by the opposing party.'" *West*, 167 F.3d at 779 (internal citations omitted).

 In this instance, Greenberg argues that the extreme sanction of dismissal is warranted,

based on the seeming alteration of the record of the communications between Elroy and

Berrouet, viewed in the context of the destruction of handwritten notes by Elroy and Goldstein

and the delayed production of the videotapes.  Even considered in that larger context, however,

and even assuming Koch or his agent deliberately altered the Elroy memorandum, Koch's

conduct in this instance does not warrant the extraordinary sanction sought.

1.    <u>Koch's Duty To Preserve Evidence Regarding the Investigation</u>

As a threshold matter, it appears that Koch had a duty to preserve his – or his agents' –

communications with any wine chateau, made in connection with his investigation of the

authenticity of the wine at issue in this case, given his own admission that, as of the time of the

investigation, litigation was anticipated. (*See* Koch Opp. 2, at 15 (in claiming work product

protection for documents related to the investigation, conceding that litigation was anticipated at

the time; *see also, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,

685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("It is well established that the duty to preserve

evidence arises when a party reasonably anticipates litigation.").) Thus, based on the general

rule set forth above, *see Kronish*, Koch's failure to preserve Elroy's original communications

with Berrouet, as well as his failure to preserve Elroy's and Goldstein's notes of their meetings

with chateau representatives, violated his obligation to preserve evidence.[12]

2.    <u>Degree of Koch's Fault</u>

While Koch did not produce the videotapes in a timely manner, he did ultimately produce

them, and thus cannot be faulted for "spoliation" of those tapes. He also cannot be greatly

faulted for his failure to preserve the handwritten notes of investigators' meetings with chateau

representatives, given that the information in those notes was purportedly memorialized in

written summaries. Elroy testified at deposition that he believed that his practice of destroying

his notes after preparing such summaries was proper, and Koch now argues that Second Circuit

case law supports this view. (*See* Koch Opp. 2, at 13-14 (citing, *e.g., United States v. Elusma*,

849 F.2d 76 (2d Cir. 1988)).) The cases on which Koch relies are, however, taken from the

_____

[12] Of course, it cannot be said that Koch violated his obligation to preserve the
videotapes, as they were, in fact, preserved, although belatedly produced.

criminal context (where it has been held that the destruction of handwritten notes by law enforcement officials after their contents have been incorporated into a formal report does not violate the prosecution's obligations under *Brady*[13] or the Jenks Act, 18 U.S.C. § 3500[14]), and it is not at all clear that the same standard should apply in a civil context.   Nonetheless, the Court notes that Elroy had worked as a federal agent in the past, and that his belief that he could continue to follow procedures that the Second Circuit has endorsed in the criminal context was not wholly unreasonable.   In any event, this Court has not been presented with a basis for concluding that, as a general matter, the destruction of the notes was done in bad faith.   *See In re Take-Two Interactive Software, Inc. Derivative Litig.,* No. 06 Civ. 5279 (LTS), 2009 WL 1066251, at *5 (S.D.N.Y. Apr. 21, 2009) (on record presented, which showed that defendant had a regular practice of creating written minutes from handwritten meeting notes, finding defendant's practice of destroying his notes, after preparation of the draft minutes, was neither in bad faith nor grossly negligent).

Koch's fault is greater, however, with respect to the particular matter about which Greenberg primarily complains – the apparent alteration of the Elroy memorandum.   The creation of two versions of Elroy's memorandum, and Koch's supplying of only the more favorable version of that memorandum to his then-expert witness, suggests that Koch, or an

---

[13] *Brady v. Maryland*, 373 U.S. 83 (1963), provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   *Id.* at 87.

[14] "The Jencks Act imposes a duty on the government, after a government witness has testified on direct examination, to deliver to the defendant upon request any statement of the witness in the government's possession which relates to the subject matter of the testimony." *U.S. v. Sanchez*, 635 F.2d 47, 65 (2d Cir. 1980).

agent of Koch, made a deliberate decision to alter this piece of evidence, rather than to preserve it (or the underlying correspondence) in its authentic form.  Koch has provided no plausible, legitimate explanation for the differences in the two versions of the letter supposedly quoted by Elroy.  Koch has not even explained – or provided any evidence – as to which version of Elroy's letter (if any) was, in fact, sent to Berrouet.  Koch's arguments that the two versions are substantially similar and that both are factually "accurate" miss the mark.  Whoever altered the memorandum appears to have wanted to put words into Berrouet's mouth, and it is no excuse that Berrouet might have written the same email in response to a letter he did not actually receive.  Indeed, Koch's inexplicable failure to disclaim a seemingly altered document raises questions about his present good faith with respect to this issue.  *Cf. Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002) (sanctioning a party, at least in part, for failing to correct fraudulent submissions "even when confronted with evidence undermining the validity of those submissions").

Still, Greenberg has only shown, at most, that Koch or his agent engaged in a single instance of altering evidence – and Koch has actually produced both versions of the memorandum in question.  There is certainly no suggestion here that Koch has engaged in a widespread pattern of presenting false evidence to the Court, and this militates against the imposition of severe sanctions.  *See West*, 167 F.3d at 779 (noting that dismissal is a "drastic sanction" that should be imposed "only in extreme circumstances"); *see also* 7 Moore's Federal Practice § 37.121 (2011) ("Courts are likely to respond to spoliation of evidence with the ultimate sanction of dismissal or default in two situations:  (1) The destroyed evidence is central to the disposition of an issue, claim, or defense, on which the outcome of the entire litigation turns, or (2) The guilty party has engaged in such wholesale destruction of primary evidence that

34

the court cannot fashion effective issue related remedies."); *Jung v. Neschis*, No. 01 Civ. 6993 (RMB), 2009 WL 762835, at *21 (S.D.N.Y. Mar. 23, 2009) (explaining that, in the context of imposing sanctions for fraud on the court, "courts have generally reserved the sanction of dismissal for those cases where a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### 3.    Degree of Prejudice to Greenberg

The Elroy memorandum is certainly relevant to issues in this case. Further, as the parties dispute the authenticity of magnums of Petrus from the 1920s, the difference between the two versions of the Elroy memoranda is material. In particular, opinions of a Petrus representative that he had "never observed a 1921 Petrus magnum," had "never heard of such a bottle," and believed the bottle shown to him to be a "forgery" all directly support Koch's claims in this case. In fact, as noted above, Koch's former expert relied, in part, on this supposed opinion of Berrouet in concluding that one of the bottles of wine at issue in this case is counterfeit. (*See supra* at 27.)

Nonetheless, the question of whether a representative from Petrus opined that he was not aware of any magnums of 1921 Petrus is not dispositive of any issue in this case, and the alteration of the Elroy memorandum has not prevented Greenberg from developing a full defense to Koch's claims. On this point, the Court notes that, had Greenberg wished to discover the truth of what Berrouet actually said or believed, Greenberg would have been free to seek documents or deposition testimony from Berrouet, in discovery. Regardless of whether Greenberg opted to pursue such discovery, he cannot contend that he learned of the two versions of the Elroy memorandum on the eve of trial, or that he was otherwise deprived of the opportunity to explore, in full, the discrepancy between the two versions. In addition, the Court accepts Koch's

35

representations that he will not rely on either version of the Elroy memorandum at trial (*see* Koch Opp. 2, at 12), and that he will also not call his former expert, who relied on the seemingly altered version of the memoranda (*see id.*).  Depending on how the trial proceeds, however, Greenberg may be able to place both versions of the Elroy memorandum before the jury, either to impeach Elroy's credibility or to impugn the reliability of Koch's purported investigation. Thus, at trial, Greenberg may actually stand to *benefit* from the altered document, which will not be used against him, but which he may be able to use to support his defense.

Greenberg has also not shown that he would suffer any prejudice at trial from the destruction of Elroy's and Goldstein's handwritten notes.  Although Greenberg suggests that the chateau representatives were unlikely to have given the opinions attributed to them in the summaries prepared by Elroy and Goldstein (*see* Greenberg Mem. 2, at 13-14), many of those representatives have been deposed in this case (*see* Koch Opp. 2, at 16), and Greenberg has not cited any testimony by any of them contradicting those summaries.  Nor has Greenberg argued that the now-produced videotapes contradict the summaries.  Thus, based on the record before the Court, Greenberg's theory that Elroy and Goldstein's notes would be different from the summaries is mere speculation.  *See Take-Two*, 2009 WL 1066251, at *5 (denying sanction for spoliation where the "[p]laintiffs' assertions concerning the prejudicial impact of the destroyed documents [were] premised entirely on speculation").

Taking all of the relevant factors into account, I recommend that the Court decline to exercise its inherent authority to sanction Koch for the alteration of the Elroy memorandum. The only sanction sought by Greenberg – dismissal of Koch's claims – would simply be too extreme for the single instance of misconduct on which Greenberg's motion principally rests, especially in light of the lack of any showing by Greenberg that the identified misconduct would

36

cause him to suffer any prejudice at trial.  Should Greenberg, himself, introduce the two versions

of the Elroy memorandum at trial, the jury would be able to see the discrepancy between them

and to draw its own inferences therefrom; in this Court's view, leaving this matter to the jury

would be a more appropriate result than preventing Koch's claims from being resolved on their

merits.

## CONCLUSION

For all the foregoing reasons, I recommend that Greenberg's motion to enforce the

Protective Order and for related sanctions (Dkt. 98) be granted.  In particular, I recommend that

(1) Koch (and his experts) be precluded from relying on the Fireman's Fund documents in this

case; and (2) Greenberg be awarded the reasonable attorneys' fees and costs he incurred in

connection with Koch's violations of the Protective Order.  I further recommend that

Greenberg's motion for case-dispositive sanctions for Koch's alleged spoliation of evidence

(Dkt. 149) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Barbara S. Jones, United States Courthouse, 500 Pearl Street, Room 1920, New York, New York

10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York 10007.  Any requests for an extension of time for filing

objections must be directed to Judge Jones.  FAILURE TO FILE OBJECTIONS WITHIN

FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL

PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-*

*CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
       August 16, 2011

Respectfully submitted,

_____

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Barbara S. Jones, U.S.D.J.

All parties[15]

---

[15] The Court is providing copies of this Report and Recommendation directly to counsel for the parties; prior to filing the Report and Recommendation on the Court's Electronic Case Filing system, the Court has requested that counsel inform it whether, in their view, any portions of the Report and Recommendation should be filed under seal.

38