UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :

WILLIAM I. KOCH,                     :

                   Plaintiff,    :

                                 :        07 Civ. 9600 (JPO)

              -v-              :

                                 :       <u>OPINION AND ORDER</u>

ERIC GREENBERG,                 :

                  Defendant.  :

                                 :

------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiff William I. Koch brought this diversity action against Defendant Eric Greenberg,

asserting claims of fraud and violations of New York's General Business Law ("N.Y. GBL" or

"GBL"). Koch's claims derive from his purchase of rare French wine consigned by Greenberg

through an auction house in October 2005. Koch purchased over 2,600 bottles of wine from

Greenberg at the auction, and he subsequently claimed that 24 of those bottles were counterfeit.

In March and April 2013, this Court held a three-week jury trial on Koch's claims. The trial was

bifurcated between an initial phase—covering liability and non-punitive damages—and a

punitive damages phase. On April 11, 2013, the jury returned a verdict for Koch on all three

claims, awarding compensatory damages of $355,811 (the purchase price for the 24 bottles) and

an additional $24,000 in statutory damages on one of Koch's GBL claims ($1000 per bottle).

(Dkt. No. 451.) The next day, April 12, 2013, the jury returned a verdict in Koch's favor in the

second phase of the trial, awarding Koch $12 million in punitive damages. (Dkt. No. 452.)

       Presently before the Court are Greenberg's motion for judgment as a matter of law, or, in

the alternative, for a new trial (Dkt. No. 495), and Koch's motion for attorney's fees, injunctive

relief, and interest (Dkt. No. 497.) For the reasons that follow, the motions are granted in part

and denied in part:  (1) Greenberg's motion for judgment or for a new trial is denied, except to the extent that (a) the $355,811 compensatory damages award is reduced to $212,699, pursuant to New York General Obligations Law § 15-108, as a result of Koch's prior settlement with Zachys, and (b) the $12 million punitive damages award is remitted to $711,622; (2) Koch's request for attorney's fees is denied; (3) Koch's request for injunctive relief is denied; and (4) Koch's request for pre- and post-judgment interest is granted.

I.      **Background**

Familiarity with the background of this case is presumed, and the Court addresses only those aspects of its factual and procedural background that are relevant to the instant motions.

A.      **Factual Background**

This case concerns the sale of 24 bottles of wine by Zachys Wine Auctions, Inc. ("Zachys").  These 24 bottles of wine, which were among a larger set of bottles consigned by Greenberg and purchased by Koch, bore certain indicia of inauthenticity, suggesting that the wine was counterfeit, or not what it was purported to be.  After discovery of this fact, Koch brought suit against Greenberg, alleging common law fraud and claims under N.Y. GBL §§ 349 and 350, which address deceptive business practices.  The trial was bifurcated into two phases, with the first encompassing liability and the second addressing Koch's claim for punitive damages associated with his fraud allegations.  On April 11, 2013, the jury found in favor of Koch on all claims, specifically finding that Greenberg had committed fraud under two theories—affirmative misrepresentation and fraudulent concealment—and that he had engaged in materially deceptive business practices in violation of GBL §§ 349 and 350.  The jury awarded compensatory damages of $355,811—representing the purchase price for the 24 bottles—and an additional $24,000 in statutory damages under GBL § 349, which authorizes

2

"treble damages" up to $1000 per violation.  On April 12, 2013, the jury awarded Koch $12 million in punitive damages.

### B.      Procedural Background

In an opinion and order dated September 30, 2012, the Honorable Barbara S. Jones, to whom this case was previously assigned, denied Greenberg's motion for summary judgment, holding that there were genuine disputes of material fact with respect to the claims at issue here. *Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ), 2012 WL 7997484 (S.D.N.Y. Sept. 30, 2012).  On October 24, 2012, this case was reassigned to the undersigned.

Jury selection for trial began and was completed on March 26, 2013.  The first phase of the trial took place from March 27, 2013 through April 11, 2013.  The punitive damages phase of the trial lasted one day, beginning and ending on April 12, 2013.  At the close of evidence, Defendant's counsel asked the Court that his motion for judgment as a matter of law be "deemed made now with briefing to be filed in due course."  (Tr. 2109.)[1]  The Court reserved on the motion, subject to later briefing.  (*Id.*)

Defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial, was filed on June 21, 2013.  (Dkt. No. 495.)  Plaintiff's opposition was filed on August 2, 2013 (Dkt. No. 503), and Defendant replied on August 23, 2013 (Dkt. No. 505.)  Plaintiff filed his motion for attorney's fees, injunctive relief, and interest on June 24, 2013.  (Dkt. No. 497.)  Defendant's opposition was filed on August 9, 2013 (Dkt. No. 504), and Plaintiff replied on September 10, 2013 (Dkt. No. 507).

---

[1] The trial transcript appears on the docket at entry numbers 454, 456, 458, 460, 462, 464, 466, 468, 470, 472, 474, 476, 478.  The pages are numbered continuously from 1-2516.  Accordingly, citations to the trial record are as follows, with the corresponding page number: "Tr. __."

3

## II.        Legal Standards

### A.        Motion for Judgment as a Matter of Law Pursuant to Rule 50

Federal Rule of Civil Procedure 50 provides that a motion for judgment as a matter of

law may be made at any time before the case is submitted to the jury, and, in the event of denial,

the movant may renew the motion no later than 28 days after trial.  Fed. R. Civ. P. 50(a)(2), (b).

"In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it

'must draw all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence.'"  *Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241,

247 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

(2000) (citations omitted)).  The movant's burden on a Rule 50 motion will be "particularly

heavy after the jury has deliberated in the case and actually returned its verdict."  *Id.* at 248.

Thus, in order to grant such a motion, "there must be 'such a complete absence of evidence

supporting the verdict that the jury's findings could only have been the result of sheer surmise

and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that

reasonable and fair minded men could not arrive at a verdict against him.'"  *Song v. Ives*

*Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (quoting *Mattivi v. South African Marine*

*Corp.*, 618 F.2d 163, 168 (2d Cir.1980) (citation omitted)).

As this Court has cautioned before, "whenever a court contemplates encroaching on the

role of the jury, it should recall that the jury trial is central to the democratic system envisioned

by our Founding Fathers."  *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2012

WL 5506121, at *1 (S.D.N.Y. Nov. 7, 2012).  As one such Founder "colorfully noted, trial by

jury is a key 'indemnification against being ridden like horses, fleeced like sheep, worked like

cattle, and fed and clothed like swine and hounds.'" *Id.* (quoting The Revolutionary Writings of John Adams 55 (C. Bradley Thompson ed., 2000)).

Accordingly, with both the role of the jury and Rule 50's "stern standard" in mind, the Court must "give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (quotations and citation omitted).

### B.   Motion for a New Trial Pursuant to Rule 59

After a jury trial and upon motion, a court may "grant a new trial on all or some of the issues—and to any party . . . ." Fed. R. Civ. Pr. 59(a)(1).  "A motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" *Song*, 957 F.2d at 1047 (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (citations omitted)).  Rule 59 motions differ from motions for a new trial pursuant to Rule 50 in two significant respects.  First, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  And second, in considering a Rule 59 motion, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Id.* "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *Id.* at 133 (citations omitted).  Despite this, however, a court will grant a Rule 59 motion only when the jury's verdict proves "egregious" in light of the evidence presented at trial. *Id.* at 134 (quotations and citations omitted).

**III.    Defendant's Motion for Judgment as a Matter of Law**

**A.    Fraud Claim**

Greenberg contends that Koch "failed to present clear and convincing evidence of fraud." (Defendant Eric Greenberg's Memorandum of Law, Dkt. No. 496 ("Def.'s Mem."), at 2.)  Fraud requires the following elements: (1) representation of material fact; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) injury.  *Koch v. Greenberg*, No. 07 Civ. 9600 (BSJ), 2008 WL 4778813, at *6 (S.D.N.Y. Oct. 31, 2008).  The jury was properly instructed as to each of these elements (Court Ex. 7), which were reiterated in the verdict form.  (Dkt. #451.)

As to the first two elements, Greenberg argues that the trial record was devoid of any actionable misstatement made by Greenberg, contending instead that (1) most of the statements in the auction catalogue were non-actionable statements of opinion; and (2) Zachys, rather than Greenberg, made the statements at issue.  First, the jury was instructed that statements of opinion are non-actionable except in the limited circumstance where such a statement of opinion is not sincerely held.  *See, e.g.*, *Union Carbide Corp. v. Montell N.V.*, 9 F. Supp. 2d 405, 409 (S.D.N.Y. 1998) ("However, even an expression of opinion may be actionable if it is not sincerely held.").  Additionally, the jury was instructed, at Greenberg's request, on the non-actionable nature of so-called "puffery" or "trade-talk."  *See Bareham & McFarland, Inc. v. Kane*, 228 A.D. 396, 398 (4th Dep't 1930) ("Neither can the statements complained of be made the basis of an action in fraud, if they are nothing more than a recommendation of the plaintiff's wares.  It is common knowledge that dealers are wont to put the best side out, and extol their goods.  The public is so familiar with 'dealer's talk' that it is generally regarded as a mere expression of opinion, and, where the parties deal on equal terms, is not relied upon to any great extent." (citation omitted)); *accord Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 167-69 (E.D.N.Y. 2012)

6

("Statements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events." (citations omitted)).

It is axiomatic that "juries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quotations and citations omitted). Accordingly, it is nothing more than conjecture for Greenberg to assume that the jury's finding of fraud by affirmative misrepresentation was based on vague statements in the auction catalogue such as one that Greenberg's 17,000-bottle collection was the "best-of-the-best." The jury was explicitly instructed that general statements of puffery concerning the status of a vendor's wares are insufficient, as a matter of law, to give rise to actionable fraud. (*See, e.g.*, Court Ex. 7, at 7 ("Examples of such [non-actionable] statements are vague claims of superiority over comparable products or exaggerated and boasting statements upon which no reasonable buyer would be justified in relying.").) Citing the charge conference, Greenberg contends that Koch suggested at trial that such statements were not puffery, but rather, were actionable, insincerely held statements of opinion. (Tr. 2024.) Again, in accordance with Greenberg's request, the jury was instructed on the difference between the two, and is presumed to have followed that law. (*Id.* at 2118:8-22; *see also id.* at 2165:19-2166:16.)[2] Moreover, aside from such vague superlatives, the

---

[2] In closing argument, Greenberg's counsel stated as follows with regard to puffery:

> He says, look, the ad said terrific house, this house is only 2100 square feet. You know, a terrific house is 21,000 square feet. That's a terrific house. I was misled. And it says spacious living room. This living room is only 20 feet by 20 feet. What are you talking about? A spacious living room is a hundred feet long and 50 feet wide. That's a spacious living room. You defrauded me.
> And wonderful yard, I got there, I walked out in the yard. No fountains. Where were the tennis courts, the Olympic size swimming pool? There was not even a swimming pool. Not even room to play polo or a putting green. That was a wonderful yard. You said wonderful yard.

record contains several additional potential statements of fact, or potentially insincerely held opinions, that the jury could have reasonably construed as actionable misstatements.  (*See* Plaintiff's Opposition, Dkt. No. 503 ("Pl.'s Opp."), at 4-6.)

Greenberg also argues that none of the possible misstatements alleged as the bases for fraud were "made by Greenberg at all," but rather, "were made by [Jeff] Zacharia in the Zachys auction catalogue."  (Def.'s Mem. at 4.)  First, under New York law, while a plaintiff may not generally claim reliance on statements made by third parties, so long as plaintiff is among the "class of persons" intended to rely on the statement, Rest. (Second) of Torts § 533 (1976), it is unnecessary that such "representations should be made to the plaintiff directly."  *Greene v. Mercantile Trust Co.*, 60 Misc. 189, 193 (N.Y. Sup. Ct. 1908); *accord Ostano Commerzanstalt v.*

---

That was a fraud.  My interpretation of wonderful yard is what I just described to you.  And great location, this is just in New Rochelle.  I thought it was Beverly Hills or Sutton place.

You don't get to do that, and there is a reason you don't get to do that.  *The judge will give you an instruction explaining why you can't do that.  He is going to read to you general assertions or expressions of a seller in praising the product being offered for sale, commonly called dealer's talk, trade talk, or puffery, do not constitute a basis for a fraud claim.  Examples of such statements are vague claims of superiority over comparable products or exaggerated and boasting statements upon which no reasonable buyer would be justified in relying.*

How much testimony did we hear from Mr. Koch about having read Alexander the Great, the Alexander the Greats of the collecting world?  After reading that, he then read all kinds of things.  These wines had to be genuine because Alexander the Great only collected genuine wine.  They had to be stored a certain way because Alexander the Great had a great wine fridge.

All of that is not a representation, and all of the things that Mr. Koch said he thought it meant is not actionable, as we call it in law.  You can't sue somebody over it, because it's dealer's talk or trade talk or puffery.  "Puffery" is a funny word.  But it is sort of puffing.  Great house, great lawn.  People do that.

(Tr. 2165:4-2166:16 (emphasis added).)

*Telewide Systems, Inc.*, 794 F.2d 763, 766 (2d Cir. 1986) ("[F]raudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party." (citation omitted)).  Accordingly, even if Greenberg's statements were made to Zachys or its owner, rather than to Koch himself, so long as Greenberg reasonably expected auction attendees to rely on those statements—a conclusion the jury was free to reach in light of the record—they may be actionable representations under New York law.  Greenberg also asserts that Zachys, rather than Greenberg, drafted the entire catalogue, developing its own representations concerning the wine that were separate from any representations made by Greenberg.  (*See* Def.'s Mem. at 5 ("Indeed, Zachys' control over the catalogue extended to every representation therein . . . .").)  However, given the testimony at trial, it was reasonable for the jury to find that Greenberg was a driving force behind the catalogue's representations.  (*See* Pl.'s Opp. at 7-8.)  The jury was free to accept the testimony of Greenberg and his witnesses that the catalogue's representations were those of Zachys and Zachys alone; however, it appears to have rejected this interpretation of the evidence.  (*See, e.g.*, Dkt. No. 451 at 13 (apportioning blame for Koch's GBL claims at 100% for Greenberg and 0% for Zachys with respect to the § 349 claim and at 75% for Greenberg and 25% for Zachys with respect to the § 350 claim).)

As noted above, the jury also found Greenberg liable for fraud on an alternative ground: namely, pursuant to the theory of fraudulent concealment.  The jury was properly instructed that, under New York law, silence or omission with respect to a material fact can serve as the equivalent of an affirmative misrepresentation where either: (1) "one party possesses superior knowledge, not readily available to the other," or (2) "the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other

party it cannot give only half of the truth." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d. Cir. 1993) (citation omitted).  Either theory can give rise to liability for fraudulent concealment, and it was reasonable and permissible for the jury to conclude that Greenberg had superior knowledge not readily available to Koch concerning the bottles at issue in the case. Throughout the trial, Greenberg's counsel emphasized that Koch had the opportunity to inspect the bottles at issue, and, had he done so, he would have *seen* the indicia of inauthenticity that served as readily apparent indicators of their counterfeit status.  The jury was free to credit that argument and chose not to do so—a determination that was within the province of the jury. While the record did indicate surface-level problems with the bottles of wine—aberrational labels or irregular cork striations, for example—the record also included numerous references to information that Greenberg knew about the wine bottles, but chose not to share with Zachys or consumers.  The jury chose to agree with Koch's position that "[n]o amount of inspection would have revealed what Greenberg knew" (Pl.'s Opp. at 10), and the Court concludes that that choice was sufficiently supported by the evidence at trial.  Greenberg's arguments about the reasonableness of inspection in these circumstances are unavailing.  The jury was instructed on the meaning of facts that are "readily available," namely, that they are those facts "discovered through the exercise of ordinary intelligence by the plaintiffs."  (Court Ex. 7 at 11.)  The jury was well aware that buyers, especially sophisticated buyers, are required by law to "protect themselves" in business transactions by obtaining relevant information.  (*Id.*)  Nevertheless, all parties agreed that, for example, "a buyer is not required to conduct investigations to unearth facts and defects that are present, but not obvious," meaning that "a buyer is not expected to discover that a house is infested with termites."  (*Id.*; *see* Tr. at 2046:15-2047:12 (neither party objecting to this aspect of the jury charge).)

10

Closely akin to the issue of Greenberg's duty to disclose is the reasonableness of Koch's reliance—another required element of a common law fraud claim.  Greenberg contends that "[i]n all events, Koch's reliance on the alleged statements or omissions was unreasonable as a matter of law." (Def.'s Mem. at 14.)  At Greenberg's request, the Court instructed the jury that given the most logical interpretation of the "As-Is" clause in the auction catalog, authenticity, provenance, and merchantability of the wine were disclaimed.  (Trial Ex. 7 at 9.)  Additionally, in accordance with New York law, the jury was instructed that specific disclaimers ordinarily "preclude a finding of justifiable reliance," as required for a fraud claim.  (*Id.*)  However, in special circumstances, where the material facts upon which a plaintiff relies are "peculiarly within the [defendant's] knowledge," and not discoverable by the plaintiff through "the exercise of ordinary intelligence," such an "As-Is" clause will not act as a bar to a fraud claim.  *Danam Realty Corp. v. Harris*, 184 N.Y.S.2d 599, 600 (Ct. App. 1959) (quotations and citation omitted).  The jury was also instructed that in determining whether Greenberg possessed the requisite "peculiar knowledge," they were to examine "(1) the sophistication of the buyer and (2) the accessibility of the underlying information."  *See Koch*, 2008 WL 4778813, at *3; (Trial Ex. 7 at 9.)

Both at trial and in his post-trial motion, Greenberg argued that Koch was a sophisticated buyer who had a full and fair opportunity to inspect the wine he purchased.  (*See, e.g.*, Def.'s Mem. at 14-15.)  According to Greenberg, the difficulty of inspecting over two thousand bottles of wine "cannot trump Koch's undisputed inspection right because it is a problem entirely of Koch's own making."  (*Id.* at 15-16.)  It is Greenberg's position that a finding for Koch on this element of fraud represents a reversal of "the traditional understanding that a plaintiff's wealth and sophistication is a factor that weighs *against* a finding of peculiar knowledge."  (*Id.* at 16.)

11

In contrast, Koch notes that the jury, despite hearing Greenberg's position that Koch was a sophisticated buyer who should have inspected his purchases,[3] "found that New York's peculiar knowledge exception applies . . . ." (Pl.'s Opp. at 13.) Greenberg argues that a sophisticated buyer with access to inspection cannot, as a matter of law, be deemed to have reasonably relied where there is a specific disclaimer. (Defendant Eric Greenberg's Reply Memorandum of Law, Dkt. No. 505 ("Def.'s Rep."), at 8.) This argument simply rehashes Greenberg's argument at trial: namely, that within the meaning of the peculiar knowledge exception, given the catalogue's right to inspection, the material facts known to Greenberg were "readily available" to Koch. However, it was reasonable for the jury to conclude that, in light of all the circumstances, and despite Koch's sophistication and his right to inspect the bottles, it was unreasonably difficult or impossible for him to have discovered "what Greenberg knew." (Pl.'s Opp. at 10.) For example, while the jury determined that the indicia of inauthenticity from the bottles reflected the reality that they were counterfeit, this fact does not compel the conclusion that

---

[3] During closing argument, Greenberg's counsel noted, of the "peculiar knowledge" exception, as follows:

> I'm going to talk later about a thing called peculiar knowledge. Peculiar knowledge can cause there to be an exception to this in a certain way, and I'm going to discuss it. But I point it out to you because whether or not there is peculiar knowledge, what Mr. Koch knows is there are no representations being made. There are no guarantees being offered. There are no promises being made about the wine. It says that, and it also says, and we're not guaranteeing, warrantying. But there is nowhere you can read this catalog and imply, other than through Alexander the Great, that there is some kind of promise.
>
> Inspection. Couldn't inspect. First, the reason was, well, I just decided I wouldn't inspect because of Alexander the Great. If his wines were that good, I didn't have to inspect. Later in the trial it was, oh, no, actually the reason I didn't inspect was I would have to inspect all 17,000 bottles and that would be really hard, it would be very expensive.

(Tr. 2170:2-19.)

Koch, under the circumstances of the 2005 auction, could have reasonably been expected (1) to recognize those signs for what they were or (2) to employ an expert to spend 25 minutes per bottle on inspection at the time of purchase.[4]  Accordingly, it was reasonable for the jury to conclude that material facts upon which Koch relied were peculiarly within Greenberg's knowledge, thus permitting a finding of fraud notwithstanding the presence of an explicit disclaimer.

Greenberg also contends that Koch did not adequately prove scienter and causation. (Def.'s Mem. at 10-14.) With respect to causation, Greenberg argues that there was no evidence that Zachys would have behaved differently had Greenberg disclosed what he knew about the wine at issue.  (*Id.* at 10.)  This characterization of the evidence, however, overlooks aspects of the record from which the jury could have reasonably concluded that Koch had established causation through clear and convincing evidence.  (*See, e.g.*, Tr. at 1707:12-1709:6 (Zachariah testifying that he would have liked to have known that Bill Edgerton, an expert, had determined that some of Greenberg's bottles were counterfeit); *id.* at 1712:1-12 (Zachariah stating that he would have liked to have known that Chateau Lafleur did not use vertically branded corks until

---

[4] In closing, Koch's counsel highlighted this difficulty, noting:

> [Mr. Greenberg's counsel] says: Oh, well, this isn't that many bottles. I'm sorry. What do you have, some sort of bottle radar? You go into the warehouse and you just magically come to these 24 bottles and then you look at them? There were thousands of expensive bottles. Take a look at Exhibit 100. It's the invoice. Mr. Koch buys expensive bottles of wine. They're all expensive. Where do you start? There are hundreds of bottles in there that are over a thousand, over $2,000, over $3,000. Mr. Egan told you, it would have taken him 25 minutes a bottle to do the work to review.

(Tr. 2286:1-11.)

13

1966); *id.* at 1714:24-1715:4 (Zachariah stating that he would have liked to have known of Greenberg's belief "that vertical branding in Petrus magnums from before 1966 was not appropriate to the time"); *id.* at 1722:6-1724:19 (Zachariah testifying at his prior deposition that he would have liked to have known if Greenberg had consigned wines to Zachys that Greenberg had previously claimed were counterfeit).)  Additionally, at trial, Koch stated that if he himself had known some of this information, he would not have purchased the wine at issue.  (*See, e.g.*, *id.* at 971:24-974:8.)  The jury was within its rights to credit that testimony and was accordingly reasonable in concluding that the element of causation was met.

With regard to scienter, which may be satisfied by either knowledge or recklessness—the latter of which was defined to the jury as a representation "made without knowledge of or a genuine belief in [its] accuracy" (Trial Ex. 7 at 8)—Greenberg contends that his segregation of suspect wines and firm belief in Zachys' vetting process undercuts any claim of a knowing or reckless violation.  (*Id.* at 12.)  However, there is sufficient evidence from which the jury could conclude that Greenberg possessed the requisite state of mind.  (*See, e.g.*, Pl.'s Opp. at 12-13.)  Moreover, Greenberg's arguments concerning the potential bias or credibility of witnesses whose testimony was relevant to Greenberg's scienter are misplaced, as the Court is required to "give deference to all credibility determinations and reasonable inferences of the jury and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 137, 133-34 (2d Cir. 2008) (quotations and citations omitted).  Thus, the jury could reasonably have concluded that Koch satisfied his burden with regard to scienter.

Accordingly, the jury's finding of fraud was not unreasonable and was permissible based on the evidence at trial.

14

B.     **GBL Claims**

A successful GBL § 349 claim requires that a plaintiff prove, by a preponderance of the evidence, that (1) "the defendant has engaged in an act or practice that is deceptive or misleading in a material way"; (2) the "plaintiff has been injured by reason thereof"; and (3) the deceptive act or practice is "consumer oriented." *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343-44 (Ct. App. 1999) (quotations and citations omitted).  In contrast to "private contract disputes, unique to the parties," consumer-oriented conduct within the meaning of the statute requires acts or practices that "have a broader impact on consumers at large."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (Ct. App. 1995) (citations omitted).  Importantly, however, "[c]onsumer-oriented conduct does not require a repetition or pattern of deceptive behavior."  *Id.*  Accordingly, so long as conduct was aimed at the public at large, it is immaterial that the defendant may not have "committed the complained-of acts repeatedly—either to the same plaintiff or to other consumers."  *Id.*  Where the "acts complained of 'potentially affect similarly situated consumers,'" the consumer-oriented prong will be met. *Koch*, 2008 WL 4778813, at *7 (quoting *Oswego*, 85 N.Y.2d at 27).  GBL § 350 prohibits false advertising and has the same elements as § 349, except for the requirement that the Defendant's *advertisement* "(1) had an impact on consumers at large, (2) was deceptive or misleading in a material way, and (3) resulted in injury."  *Andre Strishak & Associates, P.C. v. Hewlett Packard Co.*, 300 A.D.2d 608, 609 (2d Dep't 2002) (citations omitted).

Here, Greenberg argues that given Zachys' role as intermediary, and Koch's sophistication as a buyer, the auction and auction catalogue cannot be considered "consumer-oriented."  (Def.'s Mem. at 17.)  The Court disagrees.  As the Court has already noted in the course of this litigation:

> Given the large number of bottles Greenberg consigned for the
> October 2005 auction, and the fact that Plaintiff's purchase of a
> small percentage of those bottles contained counterfeits, it seems
> possible that other consumers at the auction were impacted by
> Greenberg's alleged misconduct. Thus, assuming the allegations of
> the complaint to be true, it is reasonable to conclude that the
> conduct complained of affected other similarly situated
> consumers—other purchasers at the October 2005 auction—and,
> therefore, had a broad impact on consumers at large.

*Koch*, 2008 WL 4778813, at*7 (footnote omitted).

Additionally, the New York Court of Appeals has held that an "as-is" clause does not bar

a claim under the GBL. *See Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (Ct. App.

2012) ("Here, plaintiff sufficiently pleaded such causes of action, and the disclaimers set forth in

defendant's catalogs 'do not . . . bar [plaintiff's] claims for deceptive trade practices at this stage

of the proceedings, as they do not establish a defense as a matter of law.'" (quoting *Goshen v.*

*Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 326 (Ct. App. 2002) (citation omitted)).

Moreover, while a plaintiff must have suffered harm to bring a successful GBL §§ 349 or 350

claim, he need not show justifiable reliance such as that which is required for fraud. *See Koch*,

18 N.Y. 3d at 941-42 ("To the extent that the Appellate Division order imposed a reliance

requirement on General Business Law §§ 349 and 350 claims, it was error. Justifiable reliance

by the plaintiff is not an element of the statutory claim." (citation omitted)).

For the reasons discussed above, it was permissible for the jury to conclude that

Greenberg's representations or the catalogue's advertisements were materially misleading.

Again, given the apportionment aspect of the verdict form, as well as the evidence at trial

showing Greenberg's involvement with the Zachys auction and catalog, Greenberg's argument

that Zachys is to blame is unavailing.

Greenberg also argues that Koch failed to establish entitlement to additional statutory damages under § 349, which allows for treble damages up to $1,000 per violation in the event that a defendant willfully or knowingly violated the provision.  GBL § 349(h).  As discussed, there was sufficient evidence at trial from which the jury could infer that Greenberg made misrepresentations knowingly.  (*See, e.g.*, Tr. at Tr. at 175:22-23.)   Accordingly, the jury's award of additional statutory damages of $24,000 under § 349 was permissible in light of the record.

In sum, Greenberg has not met his heavy burden of demonstrating that "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him."  *Bucalo*, 691 F.3d at 127-28 (quotation sand citations omitted).

Accordingly, the Court declines to set aside the jury's verdict under Rule 50.

## IV.     Defendant's Motion for a New Trial on Liability

Alternatively, Greenberg moves for a new trial pursuant to Federal Rule 59(a)(1)(A), arguing that (1) Koch presented insufficient evidence to take the case to a jury and (2) given the evidence, the jury erred in deciding in favor of Koch.

### A.      Sufficiency of the Evidence; Clear Weight of the Evidence

Where the jury reaches a "seriously erroneous result" or the verdict constitutes a "miscarriage of justice," it is appropriate for the Court to grant a motion for a new trial.  *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983).  Here, the evidence is sufficient to support the jury's verdict.  And while it is appropriate for the Court to weigh evidence when analyzing a Rule 59 motion, *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003), here, the jury

was within its rights to credit Koch's witnesses.  While Greenberg's counsel, through vigorous cross-examination, attempted to discredit Koch and his witnesses, the jury was properly instructed on the evaluation of credibility, and Koch's witnesses were not so devoid of credibility as to warrant a new trial.  (*See, e.g.*, Tr. at 2329:16-2333:16 (the Court instructing the jury on the evaluation of witness testimony); *see also* Tr. at 2203:21-2204:22 (Greenberg's counsel attacking J.J. Cortes' credibility in closing); 2197:10-2198:6 (Greenberg's counsel attacking Jamie Ritchie's credibility in closing).)  Courts must be cautious when contemplating the disturbance of a jury's verdict.  *See Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 789 (2012) ("[O]ur precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility,' and may not 'freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.'  Indeed, we have stated that '[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" (citations omitted)).  Here, nothing in the record calls such a drastic result.

### B. Alleged Evidentiary Errors

Greenberg also cites three purported "evidentiary errors" as grounds for a new trial. (Def.'s Mem. at 21.)  While "substantial errors in the admission or rejection of evidence" can render a new trial appropriate, 11 Charles Alan Wright et al., Fed. Prac. & Proc. 2805 (3d ed. 1998), the Court's evidentiary determinations were well within its discretion and not so prejudicial to Greenberg as to warrant a new trial.

First, Greenberg cites the exclusion of Greenberg's refund offers during the liability phase as erroneous and highly prejudicial.  (Def.'s Mem. at 21.)  The fact that, on two occasions, Greenberg had offered Koch a full refund for the price of the wine that Koch contended was counterfeit was a hotly contested topic and the subject of multiple motions and applications, both before and during this trial.  While Greenberg contended that these offers were directly relevant to his scienter, Koch's position was that they were settlement offers, falling squarely within the strictures of Federal Rule of Evidence 408, which excludes compromise offers and negotiations from admission at trial.[5]  The Court's determination with regard to this difficult issue was not, as Greenberg contends, erroneous, and instead reflected a careful balancing that minimized prejudice to both parties.

On November 27, 2007, Greenberg sent Koch a letter, together with a check for $272,555.72, offering to buy back eleven bottles of wine that Koch had originally claimed were counterfeit.  (Trial Ex. 1036.)  In this letter, Greenberg stated as follows: "I am perfectly happy to repay your money and take all the bottles back.  Your lawsuit requests rescission and I agree."  Greenberg also included his desire to bring the matter to a conclusion in a "gentlemanly way."  (*Id.*)  On November 29, 2010, Greenberg offered to pay Koch $688,238.47 to compensate Koch for each of the bottles cited in Koch's Amended Complaint (a larger number of bottles than the subset of 24 at issue in the trial).  (Trial Ex. 1052.)  In that letter, Greenberg highlighted that rescission, accompanied by a full refund, is a remedy specifically provided for in the auction

---

[5] (*See* Dkt. No. 361 (Pl.'s Third Motion in Limine, to exclude evidence regarding Greenberg's settlement offers); Dkt. No. 400 (Def.'s Opposition to Pl.'s Third Motion in Limine); Dkt. No. 429 (Def.'s letter requesting reconsideration of Court's exclusion of the refund offers); Dkt. No. 431 (Def.'s letter requesting reconsideration of the Court's decision to permit the refund offers only during the punitive damages phase of the trial); Dkt. No. 447 (Pl.'s response to one of Def.'s request for reconsideration of the Court's decision regarding the refund offers).)

catalogue.  (*Id.*)  Koch refused both of these offers.  At the final pretrial conference, held on

March 18, 2013, the Court determined that while the offers were not settlement offers in the

traditional sense, as they did not explicitly call for a release, they were best "read as within the

scope of Rule 408."  (Transcript of Final Pretrial Conference, March 18, 2013 ("FPTC Tr."), at

41:2-3.) Additionally, the Court determined that the refunds' exclusion was compelled by the

risk of prejudice to Koch.  The Court determined that the limited probative value of the

refunds—which provide insight into the practices in the wine industry but not necessarily into

Greenberg's state of mind at the time of the alleged fraud—was outweighed by an attempt to

paint Mr. Koch as unreasonable and litigious in not accepting the money.  (*Id.* at 41:3-17.)[6]

In the wake of the ruling granting Koch's third motion *in limine*, which had requested

exclusion of the offers, the Court reviewed detailed correspondence from the parties, with

Greenberg requesting reconsideration in light of the Court's decision not to bifurcate the trial as

he had requested, in his own motions *in limine*, into a liability and punitive damages phase.  On

March 20, 2013, the Court received a letter from Greenberg's counsel outlining the reasoning

---

[6] In ruling on this motion *in limine*, the Court stated:

> But I think more convincing than [the refunds as within the scope
> of FRE 408] is the balance under Rule 403 mainly because I think there's
> limited probative value and I think it's substantially outweighed by the
> prejudicial effect of attempting to paint Mr. Koch as being unreasonable in
> not accepting the full refund amount.
>     You could look at it as prejudicing one side or the other.  It's two
> sides of the same coin.  But I think what's really at issue in the case is not
> the reasonable or unreasonable business practices relating to granting or
> not granting a refund, offering or not offering a refund, but when you look
> at the claims, specifically the GBL issues, the issue is the conduct, the
> statements relating to the offers of wine at the auction and not the
> subsequent refund.  So I conclude that under Rule 403, this evidence will
> be excluded.

behind Greenberg's position on the refund issue, explaining that in light of the Court's decision

not to bifurcate the proceedings, "Greenberg's refund offers [had become] relevant to a single

phase trial that includes punitive damages."  (Dkt. No. 429.)  The letter noted that given that the

reprehensibility of the conduct is relevant to a jury's punitive damages calculation, the exclusion

of the refunds would prejudicially force Greenberg to remain mute when lambasted about the

moral culpability of his actions.  Greenberg's counsel explained, "Greenberg did the right thing.

As soon as he learned that there was a problem with any items he had sold, he tried to make it

right.  He has fully honored his contract, and now he is being denied the right to point out his

honorable conduct."  (*Id.*)  Plaintiff's counsel responded, reiterating Koch's position that the

refund offers were offers to compromise the claim, and properly excluded under Rule 408,

adding that "Greenberg's 'after-the-fact' compromise offer does not tell us anything about the

reprehensibility of his underlying misconduct."  (*Id.*)

Later, prior to jury selection, and after carefully considering these arguments, the Court

determined that while the refund offers were not relevant to Greenberg's mental state at the time

of the alleged fraud, they were indeed indicative of the overall reprehensibility of his conduct,

which is part of the necessary calculus a jury employs when evaluating claims for punitive

damages.[7]  Thus, the Court determined that, while not barred by Rule 408, as they were not

---

[7] Upon reconsideration of the motion *in limine* regarding the refund offers, the Court ruled as
follows:

> Upon further review of the law and evidence, I have decided to
> permit the evidence of Mr. Greenberg's refund offers for certain limited
> purposes related to punitive damages.

> First, I have concluded these refund offers are best characterized as
> outside the scope of Rule 408. Mr.Greenberg's offers to refund the
> contract price did not affect the validity or amount that Mr. Koch's fraud

21

compromise offers in the traditional sense, the refunds were nevertheless prejudicial to Koch, and of limited probative value with respect to liability, but agreed with Greenberg as to their relevance to punitive damages.  (Tr. at 3:24-4:13.)  In the wake of this ruling, Koch raised concerns about the potential prejudice to Koch at trial, should the refunds be admitted, and suggested a bifurcated trial.  (*Id.* at 10:3-15.)  What followed was an extensive colloquy with the

---

> claim or GBL claims. The offers did not include any conditions of release of liability.
>
> Moreover, one such offer was sent after the mootness argument had been rejected by the court. After considering all the circumstances, I have concluded that the offers were not fundamentally efforts to compromise a claim, but rather offers of a specific remedy provided for in the terms of the auction contract.
>
> Second, with respect to the balance of the factors under Federal Rule 403, I have considered that it is Mr. Greenberg rather than Mr. Koch who faces the greater danger of unfair prejudice by the exclusion of the offers specifically with respect to punitive damages.  If there were no punitive damages at issue in the case, I believe the analysis would be different, but punitive damages are very much involved in the case and implicate due process concerns, as the Supreme Court has held, and require consideration of factors such as the reprehensibility of defendant's behavior and degree of harm as well as other broad-based considerations, and requiring Mr. Greenberg to remain [mute] regarding his refund offers in the face of evidence and argument regarding his alleged wanton disregard for the law, moral reprehensibility, would unfairly prejudice and, therefore, I conclude that the probative value of such evidence on the limited issue of punitive damages is not substantially outweighed by the danger of unfair prejudice or other considerations under Rule 403.
>
> That being said, defendant's counsel may not attempt to utilize these refund offers as evidence going to liability, principal liability, or the overall validity of Mr. Koch's claims or his right to be pursuing these claims in this Court. I will instruct the jury to disregard any such inference and I will also consider an appropriate limiting instruction delineating the purpose for which these refund offers may be used and I'll consider any submissions on that front.

(Tr. at 3:24-5:20.)

Court involving the potential mootness of the case without the punitive damages element, in light of Greenberg's offer of a full refund.  (*See, e.g.*, *id.* at 10:16-17 ("THE COURT: If the punitive damages are out, isn't the case moot?").)  At the conclusion of this discourse, the Court determined that bifurcation of trial between a liability phase and a punitive damages phase likely presented the optimal solution to both Plaintiff's and Defendant's concerns about any prejudicial effects of the refund offers.[8]  Despite having moved for bifurcation in one of his original motions *in limine* (*see* Defendant's First Motion Limine, *To Bifurcate Determinations of the Availability and Amount of Punitive Damages To Bifurcate Determinations of the Availability and Amount of Punitive Damages*, Dkt. No. 383), Greenberg's counsel then strenuously objected to bifurcation as a potential solution, stating that after the Court had denied that motion they had "designed the case to deal with both issues . . . ."  (Tr. at 23:19.)  The Court nevertheless bifurcated the trial, excluding the refund offers during the liability phase, while permitting the refund offers to be admitted during the second (punitive damages) phase.[9]  Despite Greenberg's repeated contention

---

[8] (*See id.* at 23:3-9 ("THE COURT: Okay. We're going to pick the jury, and I'm going to think about bifurcation in the back of my mind.  And I'm going to think about whether the case is possibly moot.  But as far as the refund offers, I've concluded that they meet the requirements of Rule 403 but only for punitive [damages], so for that reason the issue of bifurcation becomes a possibly good solution.").)

[9] In clarifying the ruling, the Court, prior to opening statements, noted as follows:

> Just to remind the parties of my ruling yesterday, I did rule that the refund offers are excluded under Rule 403 for purposes of liability but not for purposes of punitive damages.  I want to note that that ruling is subject to revisiting if the plaintiff opens the door during liability arguments or evidence to reconsideration of that ruling with respect to the relevance of refund offers.  I have decided to bifurcate the trial assuming that door is not open, so the first phase of the trial will be on liability, compensatory damages, and the second phase on punitive damages.

(Tr. at 48:12-21.)

23

that Koch's counsel had, at trial, opened the door to the refund offers and that New York law compelled the admission of the refunds (Dkt. No. 431; *see also* Tr. at 1780:3-1784:14), the Court maintained its original exclusion during the liability phase of the trial on the ground that Rule 403 warranted that result.  (Tr. at 1881:4-1882:18.)

The Court's ruling on the refund offers is in accordance with Rule 403 and was not unduly prejudicial to Greenberg.  Greenberg's argument that the refunds are relevant to his state of mind, as required for fraud, is untenable.  The fact that an individual shows remorse or is willing to "do the right thing" in accordance with business or societal practice after a wrong is discovered does not vitiate that individual's state of mind—whatever it may have been—at the time of the relevant acts.  That fact, coupled with the prejudice to Koch from evidence that could have painted him as unreasonable in pursuing the lawsuit, underscores the appropriateness of the Court's ultimate conclusion.  As for the relevance of the refunds to the GBL claims, the cases cited by Greenberg are distinguishable.[10]  Moreover, it was only after distinguishing those cases

---

[10] In *Faden Bayes Corp. v. Ford Motor Co.*, 259 A.D.2d 352 (1st Dep't 1999), the First Department affirmed the Supreme Court of New York County's dismissal of a plaintiff's GBL §§ 349 and 350 claims when the defendant had failed to include "Automatic Ride Control in the vehicle purchased by plaintiff," stating that "in view of the documentary evidence establishing defendant's voluntary disclosure of the circumstance that the vehicles in question were not equipped with Automatic Ride Control, and its refund of the $650 purchase price of the feature to plaintiff and the relatively small number of other affected customers, it is plain that defendant's practices are not deserving of sanction as "deceptive acts" or "false advertising" within the meaning of General Business Law §§ 349 and 350."  *Id.* at 352-53 (citations omitted). This case cannot be said to stand for the proposition that "Koch's refusal to accept any refunds, *is highly relevant as a matter of New York Law* to Koch's [GBL] claims . . . ."  (Dkt. No. 431 (emphasis in original).)

The other cases cited by Greenberg are similarly distinguishable.  For example, in *Baker v. Burlington Coat Factory Warehouse*, 175 Misc. 2d 951 (1998), the City Court of Yonkers held that a store's "no-refund" policy was a violation of GBL §§ 349 and 350, because it was misleading in light of consumers' "statutory right to a cash or credit card charge refund when clothing is defective and unwearable."  *Id.* at 956.  Moreover, the court held that "the defendant's

and determining that, even if they were to apply, Rule 403 warranted exclusion during the liability phase that the Court denied Greenberg's mid-trial request to reconsider its earlier determination.  (Tr. at 1881:4-1882:18.)

In any event, Greenberg was not prejudiced by the exclusion of the refund offers during the liability phase, and there is strong evidence of that fact in the form of the jury's verdict following the punitive damages phase, during which the refund offers were admitted.  Greenberg would have a stronger case for prejudice had the jury returned a verdict of $0 in punitive damages.  As noted, however, the jury returned a verdict of $12 million in punitive damages, in spite of Greenberg's counsel's emphasis on the refunds and Koch's subsequent refusal to accept them during the punitive damages phase.  Put another way, *despite* the refund offers, the jury found that Greenberg's conduct warranted millions of dollars in punitive damages; had the jury believed that the refunds reflected positively on Greenberg's state of mind, its verdict would have reflected that fact.  Accordingly, the bifurcation of trial and admission of the refunds solely during the punitive damages phase represented an appropriate solution in light of the relevant law and the balancing required by Rule 403.

---

refusal to give plaintiff a full cash refund in exchange for the [defective product] was itself misleading and deceptive."  *Id.* at 957.  Similarly, in *BNI New York, Ltd. v. DeSanto*, 177 Misc. 2d 9, 15 (1998) it was the defendant's refusal to refund payment that constituted the deceptive and misleading conduct that was violative of the GBL.  Here, the gravamen of Plaintiff's GBL claims was not that Defendant refused a refund when asked for one, but rather that he mislead would-be consumers, including Plaintiff, in the first instance.  *See also S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 637 (2d Cir. 1996) (noting, in affirming the district court's dismissal of plaintiff's GBL claim, that the objectionable terms plaintiff claimed were misleading and added at the last minute during contract negotiations were divulged to plaintiff when plaintiff "was still free to decline to accept [Defendant's] terms and to receive a refund of its deposit money (as it did), and to seek more favorable terms with another lender.").

Second, Greenberg objects to the testimony of Maureen Downey and Jaime Cortes, arguing that the two witnesses provided improper character evidence that should not have been heard by the jury.  (Def.'s Mem. at 22.)  As for Downey's testimony, it was properly admitted, and Greenberg had a full and fair opportunity to cross-examine her at trial, with Greenberg's counsel eliciting (and not moving to strike) the testimony Greenberg now cites as objectionable.  (Pl.'s Opp. at 21.)  Second, with regard to Cortes's testimony, on cross-examination, Greenberg's counsel questioned Cortes as to why he had previously called Greenberg an "asshole," highlighting potential bias and inconsistency between Cortes' statement at trial that he bore no ill-will towards Greenberg (Tr. 810:15-21; *see also id.* at 767:3-768:23.)  With respect to this inquiry, Greenberg's counsel also introduced evidence in the form of an email exchange in which Cortes stated to Koch's personal aide Brad Goldstein (referring to Greenberg):  "My info will help you guys bring this asshole down."  (*See id.* at 768:24-771:22; Trial Ex. 1048.)  Later, on redirect, and in accordance with Federal Rule of Evidence 613(b),[11] Koch's counsel questioned Cortes on the basis for his belief at the time of the email that Greenberg was an "asshole."  (Tr. 801:17-802:5.)  Upon objection from Greenberg's counsel, the Court stated that it would "briefly" allow some exposition of Cortes' belief.  (*Id.* at 802:18.)  After allowing Cortes to relay one incident, the Court sustained Greenberg's counsel's objections to all further such lines of questioning.  (*Id.* at 804:2-804:8.)   In any event, Koch's counsel mentioned the testimony only in passing during summation, as juxtaposition to Greenberg's own claim that

---

[11] Federal Rule of Evidence 613(b) provides, in pertinent part, that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it . . . ."

Royal Wine representatives threatened his own life.  (*Id.* at 2270:2-11.)  Accordingly, the admission of this testimony does not warrant a new trial.

Finally, Greenberg objects to the testimony of Jamie Ritchie and Michael Egan, claiming that they provided undisclosed expert opinions in violation of Federal Rule of Civil Procedure 37(c).  Greenberg's contention is belied by the record.  Lay testimony may encompass those areas with which the witness has familiarity without subjecting that witness to the strictures of Federal Rule of Evidence 702, so long as that testimony is not based on "scientific, technical, or otherwise specialized knowledge."  Fed. R. Evid. 702(c).  Ritchie's testimony concerning the authenticity of Greenberg's wine was a reflection of his work at Sotheby's and familiarity with the wine auction business and thus was properly within the scope of Rule 701.  *See* Fed. R. Evid. 701, Advisory Committee Notes on Rules—2000 Amendment ("For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. . . .  Similarly, courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established. . . .  Such testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge.  If, however, that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702.").

As for one of Koch's experts, Michael Egan, Greenberg objects to Egan's testimony at trial about vertical branding on the corks of 17 of the 24 bottles of wine at issue, arguing that this testimony contradicted his expert report and deposition testimony.  As Koch notes, however, it is not as if Egan originally concluded the wine was authentic and later changed his mind on the eve

of trial.  (Pl.'s Opp. at 22.)  Instead, Egan stated that he had completed additional research since

the advent of the trial, which bolstered his prior conclusions that the wine was inauthentic.  (*Id.*)

It is well established that experts may "supplement, elaborate upon, explain and subject

[themselves] to cross-examination upon [their] report[s]."  *In re Methyl Tertiary Butyl Ether*

*(MTBE) Products Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (quotation and footnote

omitted).   Egan was subjected to vigorous cross-examination on these issues.  Moreover, even if

the testimony was improperly admitted, it did not prejudice Greenberg, whose counsel repeatedly

emphasized the fact that Egan had changed his opinion during the course of the trial.[12]  In

summation, Greenberg's counsel reiterated the point, stating:

---

[12] On cross-examination, Greenberg's counsel questioned Egan about the vertically branded cork
issue, with part of the colloquy reading as follows:

> Q. You could see the branding on this cork, correct?
> A. Yes.
> Q. And you looked at it close enough to figure out that one of the
> digits on the vintage was missing, correct?
> A. Yes.
> Q. And you could see it was a vertical cork, correct?
> A. Yes, I could.
> Q. And when you saw it was a vertical cork, based upon the 20-
> plus years you have of looking at Chateau corks, particularly
> including Chateau Lafleur, it looked just fine to you; isn't that true?
> A. As I said before, I wasn't focusing on Lafleur corks. On these
> particular corks and seeing that it was becoming an issue in the
> case, I did do subsequent research including reference to
> photographs of old Chateau Lafleur corks, and I can see that the
> branding was -- should be horizontal for this period rather than
> vertical.
> Q. And when did you decide to do the subsequent work after you
> told me you had finished your work?
> A. Within the last few weeks.
> Q. The last few weeks. And what is it -- what is it, Mr. Egan, that
> all of a sudden that got into your head about this particular cork,
> which you had found to be just fine in the last few weeks? How did
> that happen?

> Now, Mr. Egan. I will tell you, I took his deposition in New England. Thought he was a pretty straightforward guy. I thought that until he gave this testimony. I thought he was a decent, straightforward man, a competent but not brilliant expert. Real worklike guy. Not a Gil Schwarz, not in that class, but all right. And so what happens? Egan says: Oh, the trial started, I changed my opinion. Vertical corks are all wrong. I said: Well, gosh, you know, we're back there in Cape Cod, you said they were all correct. He didn't say – and this is really important. He didn't say: I was mistaken. 'Cause if he'd been mistaken, he could have said that. It was embarrassing. He said, "You know, I didn't focus on the cork." Remember that? "I didn't focus on the cork." And I really went after him. "I didn't focus on the cork."

(Tr. 2185:24-2186:12.)  In sum, Greenberg's counsel utilized any inconsistency between Egan's report and his trial testimony as an opportunity for both vigorous cross-examination and argument in summation.  The admission of this testimony does not warrant a new trial.

## V.     Damages

Greenberg also argues that if the liability verdict is not set aside, then (1) the award of compensatory damages award should be reduced from $355,811 to $105,811 under § 15-108(a) of the New York General Obligations Law ("N.Y. GOL" or "GOL"), and (2) the punitive damages award must be eliminated or reduced to either $24,000, to match the exemplary damages awarded under the GBL, or one-half of the compensatory damages award.  Each argument is addressed in turn.

### A.     N.Y. General Obligations Law Offset

Greenberg argues that without an offset of $250,000—the amount that Zachys paid to Koch in a previous settlement—Koch will receive an "impermissible double recovery."  (Def.'s Mem. at 23.)  Section 15-108(a) of the N.Y. GOL provides that where a plaintiff enters into a release or covenant not to sue with "one of two or more persons liable or claimed to be liable in

tort for the same injury," the settlement "reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest."

As an initial matter, Koch argues that N.Y. GOL § 15-108(a) cannot be applied to reduce his fraud claim, because there was no fraud claim pending against Zachys when it settled (that claim had been dismissed).  However, "[n]othing in section 15-108 . . . requires that the two defendants be liable upon the same theory.  All that is required is that they be subject to liability for damages for the same injury."  *Roma v. Buffalo Gen. Hosp.*, 481 N.Y.S.2d 811, 813 (3d Dep't 1984).  Here, the fraud and GBL claims were simply alternative legal theories seeking compensation for the same wrongful conduct—as evidenced by the fact that Koch sought identical, not cumulative, damages under each claim asserted against Greenberg.

The Court also concludes that N.Y. GOL § 15-108 is potentially applicable to statutory GBL claims (and not just common law tort claims) notwithstanding its references to "tort" and "tortfeasor."  *See Mathis v. United Homes, LLC,* 607 F. Supp. 2d 411, 429-30 (E.D.N.Y. 2009); *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 677 F. Supp. 151, 153 (S.D.N.Y. 1988).

The question, then, is whether Koch's settlement with Zachys involved "*the same injury*" as the claims on which Koch was awarded $355,811 at trial.  If the answer is yes, then Koch's claim against Greenberg is "reduce[d]" by the greatest of the following:  (1) "any amount stipulated by the release"; (2) "the amount of the consideration paid for it"; or (3) "the released tortfeasor's equitable share of the damages."[13]

---

[13] Koch's argument that Greenberg has forfeited his right to seek an offset under N.Y. GOL § 15-108 is unpersuasive.  The cases cited by Koch recognize that, even if a party has waived his

The "same injury" issue is complicated by the fact that the number and identity of the bottles of wine at issue have changed more than once throughout the course of this case.  This is important:  Greenberg insisted throughout trial that Koch prove his case "bottle by bottle"[14]—and that is how the case was tried.  The verdict form required findings of liability as to *each* of the 24 specific bottles; and the compensatory damages sought and recovered at trial represented the total purchase price of those 24 bottles—no more and no less.  Thus, the fact that the Zachys settlement and the Greenberg trial both generally involved "counterfeit wine bought from Greenberg at a 2005 Zachys auction" is insufficient to establish that they involve the "same injury."

Koch's original complaint in this case, filed in October 2007 against both Greenberg and Zachys, claimed that 19 bottles of wine were counterfeit:  eight bottles purchased at a Zachys auction in October 2004 (which were *not* from Greenberg's cellar), and eleven bottles purchased at a Zachys auction in October 2005 (which were from Greenberg's cellar).  Ruling on Zachys' motion to dismiss, Judge Jones dismissed the fraud claims but not the GBL claims against

right to seek an "equitable share" offset under the third prong of the statute, and even if he has not pleaded the statute as an affirmative defense, he may still obtain an offset under the "amount of consideration paid" prong.  *See Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008) ("[Defendant's] offset under the statute was limited to the amount [Plaintiffs] received from the [settling] Defendants for their release . . . ."); *Whalen v. Kawasaki Motors Corp.*, 92 N.Y.2d 288, 298 (N.Y. 1998).  As the New York Court of Appeals held in *Whalen*, a party may amend its pleading "at any time, even after trial," if the amendment does not prejudice the other party.  *Id.*  The Court finds no prejudice here and permits the amendment requested by Greenberg.

[14] (*See, e.g.*, FPTC Tr. at 133:24-25 ("I think peculiar knowledge is bottle by bottle."); Tr. at 2015:25-2016:3 ("We ought to be able to go through bottle by bottle ourselves.  That's my real concern here.  The representation was a bottle-by-bottle representation."); *id.* at 2152:9-10 ("This is a bottle-by-bottle case.  This is not some global case about general conduct of people. You're going to hear instructions, I'm going to read to you one in a minute, that it's about 24 cases."); *see also* Dkt. No. 451 (bottle-by-bottle jury verdict form).)

Zachys.  (Dkt. No. 33.)  Koch then sought leave to file an amended complaint challenging 46

bottles of wine as counterfeit—from auctions in October 2004, December 2004, and October

2005.  (Dkt. No. 89.)  Magistrate Judge Freeman granted leave to amend as to 36 of the bottles,

but denied leave to amend as to the 10 bottles purchased in the October 2004 auction on the

ground that any GBL claims as to those purchases would be time-barred under the three-year

statute of limitations applicable to GBL claims.  (Dkt. No. 107.)

Zachys and Koch reached their settlement in January 2011.  At that time, the operative

complaint—filed in October 2010 and consistent with Magistrate Judge Freeman's order—

challenged 36 bottles of wine (which Koch had purchased for a total of $621,559 at the

December 2004 and October 2005 auctions).  Under the settlement agreement, Koch gave

Zachys a general release of all claims—including all claims in this case—in exchange for

Zachys' payment of $250,000.  However, the agreement recited that that payment

"represent[ed]" the cost of the 10 bottles purchased at the *October 2004* auction ($143,459), plus

interest and certain expenses.  The agreement also stated that the settlement would not affect

Koch's claims against Greenberg.

Koch argues that the settlement with Zachys involved an entirely different injury because

it involved different bottles than those that were the subject of the Greenberg trial.  However, the

agreement's stipulation to that effect is not dispositive:

> Settling parties may not structure the apportionment to avoid a
> later setoff by a nonsettling defendant; to hold otherwise would
> permit them to circumvent the policy underlying section 15-
> 108. . . .  [T]he New York cases establish that the parties'
> settlement agreement, even when confirmed by a court order, does
> not bind a trial court in determining the proper allocation of
> settlement proceeds for purposes of setoff.  That allocation must
> follow from a comparison by the trial court of the injuries of the
> settling plaintiffs.

*Andrulonis v. United States*, 924 F.2d 1210, *vacated and remanded on other grounds*, 502 U.S. 801 (1991), *reinstated*, 952 F.2d 652 (2d Cir. 1991).

It is utterly implausible that the settlement with Zachys did not involve, at least in part, the same claims and same injury as those arising from the 24 bottles at issue in the Greenberg trial.  The release that Koch gave to Zachys covered *all* claims, not just those relating to the 10 bottles referenced in the agreement.  Moreover, all claims as to those 10 bottles had been dismissed by the Court (the fraud claims for failure to state a claim, the GBL claims for untimeliness).  It would ignore reality to conclude that the $250,000 that Zachys paid for the release was actually for the 10 bottles that had been dismissed, rather than for the 36 bottles as to which Koch had live claims pending against Zachys.  *See Casey v. State of New York*, 119 A.D.2d 363, 368, 507 N.Y.S.2d 159, 163 (2d Dep't 1986) (rejecting parties' allocation of settlement proceeds where "$175,000 of the settlement could be allocated to a potentially nonexistent conscious pain and suffering cause of action").

It does not automatically follow, however, that a 100-percent reduction of the Zachys settlement amount is required by § 15-108.  Under New York law, the trial court must "make an independent determination of what the proper apportionment of settlement proceeds should be, based on the monetary value of each cause of action."  *Andrulonis*, 924 F.2d at 1225 (citing *Casey*, 119 A.D.2d at 367, 507 N.Y.S.2d at 163).  As noted above, the causes of action in this case have evolved over time, as defined by the particular bottles of wine at issue (and the purchase price for each of them, reflecting the ultimate measure of compensatory damages in this case).  Significantly here, Zachys settled with Koch for $250,000 at a time when 36 bottles were the subject of Koch's claims against both Greenberg and Zachys.  Shortly before trial, Koch

limited his claims to a subset of 24 of those 36 bottles (that is, he dropped his claims as to 12 bottles).

Faced with analogous circumstances—*i.e.*, where a prior settlement covered overlapping but broader injuries—Judge Kiyo Matsumoto of the Eastern District of New York has applied a proportional reduction to the setoff amount under § 15-108. *See Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 267 (E.D.N.Y. 2012), *aff'd*, 214 WL 305480 (2d Cir. 2014). This approach is appropriate here in light of the text and purposes of the statute.[15] Courts have recognized that "there is an element of speculation in attempting to apportion a settlement into relevant and irrelevant parts, especially where the latter are not before the Court." *Carter v. State of New York*, 139 Misc. 2d 423, 433 528 N.Y.S.2d 292 (Ct. Cl. 1988), *aff'd*, 154 A.D.2d 642 (2d Dep't 1989). Nevertheless, New York law calls for such an apportionment in these circumstances. *Id.*

The purchase price of the 36 bottles of wine at issue at the time of the Zachys settlement was $621,559. The purchase price of the 24 bottles at issue in the trial was $355,811. The latter is 57.245% of the former. When that same percentage is applied to the $250,000 paid by Zachys in the settlement, the result is $143,112. That number provides the best measure under § 15-108

---

[15] Greenberg argues that § 15-108 requires a dollar-for-dollar reduction even if the settlement *was* for the 10 bottles that were different from those at issue in the trial: so long as the *release* also covered the bottles at issue in the trial, he contends, the total "amount of consideration paid" for the release is "greate[r]" and therefore must be offset against Koch's damages. This argument is unpersuasive because it reads § 15-108's reference to "release" in isolation from its reference to "the same injury." The statute is implicated only insofar as the release is for "the same injury." Accordingly, if the earlier release was for a *broader* set of injuries than those at trial, the "amount of consideration paid" for the release of claims *for the same injury* will ordinarily be a subset of the total consideration paid for the earlier release, as determined by a proportional reduction. *See Barkley*, 848 F. Supp. 2d at 267. Put another way, absent such a proportional reduction in these circumstances, the setoff would mix apples and oranges.

of "the amount of the consideration paid for" the release of Zachys for the "same injury" as the claims that went to trial.

Accordingly, pursuant to N.Y. GOL § 15-108(a), Koch's compensatory damages award of $355,811 is reduced by $143,112, resulting in a modified compensatory damages award of $212,699.

### B.    Punitive Damages

Greenberg contends that his conduct does not merit an award of punitive damages, arguing that Koch, as a "sophisticated businessman and collector" declined to exercise his pre-sale inspection rights and declined multiple refund offers.  (Def.'s Rep. at 15.)  Greenberg also contends that the fact that his sale was only a single act, rather than behavior constituting repetitive, ongoing violations underscores the inappropriateness of punitive damages.  (*Id.* at 16.)

"It is not essential that the plaintiff allege a pattern of conduct directed at the public in general to assert a claim for punitive damages." *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 813 F. Supp. 2d 489, 526 (S.D.N.Y. 2011) (citations omitted).  However, it is "necessary to allege fraud that is founded upon such moral indifference as to be 'aggravated by evil' or to be demonstrative of a criminal indifference to civil obligations." *Rush v. Oppenheimer & Co., Inc.*, 596 F. Supp. 1529, 1532 (S.D.N.Y. 1984).  In sum, "[t]he conduct for which courts generally award punitive damages is that which is "close to criminality," being variously described as 'utter recklessness,' 'reckless and of a criminal nature,' 'wanton or malicious,' and 'gross and outrageous.'" *Dubai Bank, Ltd., New York Branch v. Joshi*, No. 85 Civ. 5005 (MJL), 1989 WL 168088, at *4 (S.D.N.Y. Aug. 29, 1989) (citations omitted).

Here, it was permissible for the jury to find, based on all the evidence at trial, that Greenberg's conduct warranted an award of punitive damages.  *See, e.g.*, *Koch v. Rodenstock*,

No. 06 Civ. 6586 (BSJ) (DF), 2012 WL 5844187, at *11 (S.D.N.Y. May 9, 2012), *report and recommendation adopted*, No. 06 Civ. 06586 (BSJ) (DCF), 2012 WL 5845455 (S.D.N.Y. Nov. 19, 2012) ("In this case, Defendant's alleged actions satisfy all three requirements for punitive damages.  As discussed above, Plaintiff has alleged that Defendant made concerted efforts to forge indicia of authenticity with respect to the purported Thomas Jefferson wine, which he then offered for sale to the public.  He also allegedly made knowingly false statements about the wine to auction houses and brokers, with the intent that the statements be disseminated to the public.  Defendant's conduct was thus aimed at the public generally." (citations omitted)).

First, the jury was properly instructed on the egregiousness required for punitive damages, with the Court emphasizing that punitive damages were permitted only if the jury found by "clear, unequivocal, and convincing evidence that Mr. Greenberg's fraud was gross, involved high moral culpability, and was aimed at the general public," or "rose to such a level of wanton dishonesty as to imply a criminal indifference to his civil obligations."  (Court Ex. 8 at 1.)  Moreover, the Court repeatedly underscored the fact that punitive damages are not designed to compensate plaintiffs, but rather, constitute an "extraordinary penalty similar to criminal fines."  (*Id.* at 2.)  Here, it was within the range of reasonableness for the jury to find that punitive damages were warranted, as there was sufficient evidence from which it could conclude that Greenberg acted with wanton disregard for potential buyers' rights.  Moreover, even if a single incident is ordinarily insufficient to warrant punitive damages—a principle that the parties

dispute—there was evidence from which the jury could find that this auction was not the first time Greenberg had sold counterfeit wine.[16]

If the punitive damages award is not set aside, Greenberg requests a remittitur on the ground that $12 million in punitive damages is grossly excessive under the Due Process Clause of the United States Constitution.  Greenberg proposes a remittitur of $24,000 (the amount of exemplary damages on the GBL § 349 claim) or one-half of the compensatory damages award.  (Def.'s Mem. at 27.)  In contrast, Koch argues that the $12 million punitive damages verdict is proper and should not be reduced.  (Pl.'s Opp. at 25.)

It is axiomatic that excessive punitive damages awards implicate the due process rights of defendants.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) ("Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.").  Under New York law, moreover, courts have the authority to review any damages award even in the absence of a constitutional violation.  *See, e.g.*, *West v. Hogan*, 88 A.D.3d 1247, 1251 (4th Dep't 2011) (quoting *Nardelli v. Stamberg*, 44 N.Y. 2d 500, 504 (1978)); *Strader v. Ashley*, 61 A.D. 3d 1244, 1248 (3rd Dep't 2009); *cf. Browning-Ferris Inds. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989) ("In a diversity action, . . . the propriety of an award of punitive damages for the conduct in question . . . [is a] question[] of state law."); *Payne v. Jones*, 711 F.3d 85, 97 (2d Cir. 2012) (quoting *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.2d 617, 625 (7th Cir. 2000)) ("Constitutional limits on punitive damages come into play only after the assessment has been tested against statutory and common-law principles.  When a plaintiff seeks punitive

---

[16] (*See, e.g.*, Tr. at 175:22-23 ("John Kapon [of Acker Merrall] would take anything."); Tr. at 747:23-24 ("What they did to me, I'll do to them; what they did to me, I'll do to someone else."); Ex. 476 ("The good news is that there is no garbage.  That has been sold.").)

damages in a federal case, it is unnecessary to look for limits in the Constitution." (alterations

omitted)).  New York courts may not reduce a punitive damages award unless it "is so grossly

excessive as to show by its very exorbitancy that it was actuated by passion."[17]  *West*, 88 A.D.3d

at 1251 (quoting *Nardelli*, 44 N.Y. 2d at 504); *see Payne*, 711 F.3d at 97 n.8 (citing *Gasperini v.*

*Ctr. For Humanities, Inc.*, 518 U.S. 415, 429–30 (1996)) ("[A] federal court in a case governed

by state law must apply the state law standard for appropriateness of remittitur.").  When a jury

awards punitive damages under New York law, the reviewing court must consider whether the

punishment is "reasonably related to the harm done and the flagrancy of the conduct."

*Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (Sotomayor, J.)

(quoting *Liberman v. Riverside Memorial Chapel, Inc.*, 225 A.D. 2d 283, 292 (1st Dep't 1996));

*Suffolk Sports Ctr., Inc. v. Belli Constr. Corp.*, 241 A.D. 2d 546, 547 (2nd Dep't 1997)).  The

wealth of the defendant is also relevant, because a defendant's ability to pay impacts whether

damages are sufficient to function as a punishment and a deterrent.  *Id.* (citing *McIntyre*

*v.Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D. 2d 269, 271 (1st Dep't 1998).  These factors

---

[17] New York law requires trial courts to enter an order of remittitur or additur in actions requiring
an itemized verdict if a jury's award of money damages "deviates materially from what would be
reasonable compensation."  N.Y. C.P.L.R. § 5501(c); *see also Gasperini*, 518 U.S. at 425
(holding that § 5501(c) applies to trial courts).  The "deviates materially" standard is stricter than
the former "shock the conscience" test, which is still the test for remittitur under federal law.
*Gasperini*, 518 U.S. at 425.  There is conflicting persuasive authority discussing whether
§ 5501(c) applies to punitive damages.  *Compare Payne*, 711 F.3d at 97 n.8 ("[I]t is hard to
imagine that the New York legislature expected its courts to exercise this supervisory
responsibility only as to compensatory damages, and not as to punitive damages."), *with*
*Greenbaum*, 67 F. Supp. 2d at 266 (Sotomayor, J.) (observing that § 5501(c) discusses
reasonable compensation, not punishment or deterrence; furthermore, § 5501(c) applies only to
money judgments issued in actions requiring itemized verdicts under N.Y. C.P.L.R. § 4111, and
§ 4111 discusses itemized verdicts only for compensatory damages).  The Court need not address
this question because this action does not fall within the categories of cases requiring an itemized
verdict under § 4111, and therefore, § 5501(c) does not apply.

help the Court determine whether the underlying test has been met:  whether an award is so exorbitant as to show that it was motivated by passion.  *Id.* at 268.

 "Awards of punitive damages are by nature speculative, arbitrary approximations.  No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct.  Nor is there any formula to determine the dollar amount needed to effectuate deterrence." *Payne*, 711 F.3d at 93 (citations omitted).  But despite the unscientific nature of punitive damages calculations, courts have a responsibility "to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Id.* (citations omitted).  It should be noted that juries that award punitive damages, "[h]aving no objective standards to guide them, and understandably outraged by the bad conduct of the defendant, [] may be impelled to set punitive damages at any amount." *Id.* at 93–94 (citation omitted).  In such cases, a Court may enter an order of remittitur, which sets aside the jury's award and orders a new trial unless the plaintiff agrees to accept a lesser amount specified by the court. *Id.* at 94.

To determine the constitutionality of a jury's punitive damages award, courts consider three "guideposts" described by the Supreme Court in *Gore*, and reiterated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003):  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citation omitted).   These guideposts mark the outer limits of a court's discretion to uphold a jury's award of punitive damages under the Due Process Clause, but they also inform the court's review of such awards for excessiveness that is short of constitutional excessiveness. *See Payne*,

39

711 F.3d at 96–97, 101 n.13 (*Gore* guideposts apply to punitive award claimed to be excessive under federal and New York law, but not under the Constitution).  Using these factors, a court must make its own determination about the reasonableness of a jury's punitive damages award, as juries that render such awards may not have sufficient information to allow for a fair and tailored punishment.  *Id.* at 94; *accord id.* at 96 ("The courts, accordingly, bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to those desiderata and are not excessive.").

In this case, the *Gore* guideposts indicate that the $12 million punitive damages award is excessive and cannot stand.  The Court need not reach the question whether the jury's award violates the Due Process Clause; the award is excessive under New York law, and the Court holds that an award of punitive damages greater than two times compensatory damages is so exorbitant that it is motivated by passion rather than reason.[18]  The following discussion is organized according to the *Gore* guideposts; relevant factors under New York law are paired with their analogous guideposts.

First, the Court considers the reprehensibility of the conduct at issue, examining whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419 (citation omitted).  This is the most important indication of the reasonableness of punitive damages; it should be assumed that the plaintiff is made whole by

---

[18] The Court notes that it would reach the same decision under the due process analysis, requiring remittitur in the same amount.

compensatory damages, and therefore, the further sanction of punitive damages is warranted only insofar as the reprehensibility of the defendant's conduct requires punishment or deterrence. *Id.* New York law calls for a similar inquiry into the "harm done and the flagrancy of the conduct." *Greenbaum*, 67 F. Supp.2d at 267. The reprehensibility and flagrancy of Greenburg's conduct indicate that some punitive award is appropriate in this case. To deceive for one's personal, pecuniary gain and exploit one's superior knowledge—the gravamen of the fraud here—reflects reprehensibility that warrants some sanction. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008) ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure."); *see also Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 85, 86 (2d Cir. 2007) (affirming district court's $1 billion punitive damages award in an Illinois fraud case, where that figure constituted approximately 20% of the defendants' net worth and the behavior was intentional and repetitive, but did not implicate the other reprehensibility factors of *State Farm*).

It is also true that Greenburg's conduct in this case can be characterized as flagrant. With its verdict, the jury found that Greenberg had brazenly committed 24 acts of fraud—that is, that he had made false statements or misleading omissions with respect to each of the 24 bottles at issue in the case, which he sold for up to tens of thousands of dollars each. Moreover, there was evidence from which a reasonable jury could infer that Greenberg had engaged in this sort of behavior before. (*See, e.g.*, Tr. at 747:23-24 ("What they did to me, I'll do to them; what they did to me, I'll do to someone else."); Ex. 476 ("The good news is that there is no garbage. That has been sold.").)

Greenberg again emphasizes the refund offers as indicia of his upstanding approach to business and lack of reprehensibility. (*See* Def.'s Mem. at 31 "Greenberg's immediate refund

41

offer to Koch is a further 'mitigating factor[]' that removes his conduct from the reprehensible type that courts seek to punish severely." (citations omitted).)  It is true that Greenberg's refund offers can be regarded as mitigating the reprehensibility of his overall conduct, and for that reason the Court admitted evidence of those offers in the punitive damages phase of the trial. However, the jury heard this argument and nevertheless awarded punitive damages, indicating that it viewed the refund offers otherwise.  While Greenberg is correct that the refund offers could be seen as his above-board attempt to "stand behind his wine,"[19] it is also possible to view those offers as the attempts of a fraudster, upon being caught, to remove the threat of litigation. Put another way, the refund offers, which could be construed as attempts to silence Koch with hush money rather than admirable business actions, do not necessarily vitiate the initial flagrancy involved in Greenburg's fraud.

While the flagrancy of Greenburg's fraud merits some award of punitive damages, the harm he caused is less compelling.  This harm was economic in nature and none of its targets— neither Koch nor other potential buyers at auction—were financially vulnerable.  Moreover, the tortious conduct did not evince an indifference to, or reckless disregard for, the health or safety of others, as Koch himself characterized the wine at issue as collectible artifacts rather than something that he would actually imbibe.  *Compare Silvanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 262–63 (S.D.N.Y. 2001) (upholding punitive damages less than three times compensatory damages where fraudulent conduct resulted in multiple plaintiffs becoming infected with Legionnaires' Disease; one plaintiff suffered debilitating brain injury).  And even

---

[19] (*See* Tr. at 2401:14-18 ("At this point Mr. Greenberg offers Mr. Koch all of his money back and more, as you will see. You heard Mr. Greenberg testify it was his practice always to stand behind the wine and to offer refunds to anyone who complained.  In fact, he does that in this letter.").)

in the realm of strictly economic harm, this fraud is not among the most reprehensible offenses. The fraud at issue did not implicate a person's home, *cf. Barkley v. Olympia Mortg. Co.*, __ Fed. App'x. __, 2014 WL 305480 (2d Cir. 2014) (upholding $60,000 in punitive damages awarded to each of six plaintiff homeowners for fraud resulting in plaintiffs purchasing seriously substandard homes), or even the profitability of a business, *cf. Motorola Credit Corp.*, 509 F.3d at 86 (affirming remittitur to $1 billion, which was half compensatory damages). This dispute is about an extremely high-end luxury item. Greenberg deceived a wealthy collector whose hobby involves expenditures that most people will never contemplate.

Turning to the second guidepost—"the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"—Greenberg contends that the "33-to-1 ratio of the jury's punitive damages to its compensatory damages is patently unconstitutional." (Def.'s Mem. at 32.) As noted, due process concerns figure prominently in determining the permissible amount of punitive damages, and the Supreme Court has indicated that "the relevant ratio [is] not more than 10 to 1." *Gore*, 517 U.S. at 581 (footnote omitted). The Supreme Court has also explained that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. But the Court has consistently emphasized that there is no bright-line rule; each award must be based on the "facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* ("We decline again to impose a bright-line ratio[,] . . . however, . . . we [have] concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . While these ratios are not binding, . . . [s]ingle-digit multipliers are more likely to comport with due process." (citations omitted)). New York courts also consider the relationship between punitive damages

and the harm done to determine whether a punitive award is so exorbitatnt that it must have been motivated by passion, rather than reason. *See Greenbaum*, 67 F. Supp. 2d at 267 (citing *Nardelli*, 44 N.Y. 2d at 504).

Here, the jury's $12 million award of punitive damages was over 33 times that of the compensatory award of $355,811 (and 56 times the reduced compensatory award of $212,699 following the setoff discussed above)—well beyond four times the amount of compensatory damages, which may be "close to the [constitutional] line," and even well beyond the presumptive constitutional limit of 10 times compensatory damages suggested in *State Farm*. 538 U.S. at 425. These ratios are not binding limits, but they do stake off the zone of the harshest possible punitive damages the Constitution will tolerate—a zone that should be reserved for the most egregious conduct. The fraud in this case did not result in death, serious physical injury, or even minor physical injury. The fraud did not risk any such injury. The fraud did not result in a restriction of liberty or an insult to Koch's human dignity by way of discrimination. The fraud did not cause an economic loss that interrupted Koch's life by interference with his housing, employment, or savings for retirement. And the fraud did not involve actually or potentially vulnerable victims. In the scheme of conduct that can be punished by damages in a civil case, this is not a fraud deserving of punishment that pushes the limits of the Due Process Clause.

The final guidepost requires the Court to examine comparable civil penalties and similar cases. As Greenberg notes, the maximum civil penalty for willful deceptiveness under the GBL is $1,000 per violation, which here was $24,000. Moreover, in a similar case, *Rodenstock*, Judge Jones, in adopting Magistrate Judge Freeman's recommendation, awarded punitive damages in an amount *equal* to compensatory damages, or a 1:1 ratio. *See* 2012 WL 5844187, at *12

44

("Although Plaintiff seeks an award of punitive damages in an amount that would be double his compensatory damages, this Court has reviewed relevant precedent, and concludes that an award equal to Plaintiff's compensatory damages—*i.e.,* $311,486.90—would be more appropriate in this case."). In doing so, Judge Freeman noted that while some similar cases had "awarded punitive damages as a multiple of actual damages, such cases have tended to involve fairly modest actual damages awards—generally not in the six- or seven-figure range." *Id.* (footnote omitted). It is true that this case bears some similarity to *Rodenstock*. However, that case involved a default judgment against an absent defendant, without a trial or other factfinding. It also involved a significant compensatory award that may have financially devastated the defendant. This is why New York precedent requires courts to consider a defendant's ability to pay when assessing the proper amount of punitive damages. *Greenbaum*, 67 F. Supp. 2d at 267 (citing *McIntyre*, 256 A.D. 2d at 271).

In this case, while a six-figure compensatory award is significant in the absolute sense, it is less so in the relative sense—particularly in the context of high-end wine auctions where a single bottle may sell for $20,000, and in light of the wealth of the inevitable participants in such auctions, including Greenberg. To deter individuals in this rarefied class, a punitive damages award less than or equal to the compensatory figure would likely have limited deterrent effect. And while the $1,000-per-violation cap of the GBL claims' exemplary provision provides a comparative measure, it is clear that in New York the GBL's treble damages provision does not proscribe an additional award of punitive damages. *See, e.g.*, *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167 (2d Dep't 2010).

Having considered the *Gore* guideposts and relevant factors under New York law, the Court determines that punitive damages are appropriate, but that remittitur is legally required.

45

While Greenberg would have the Court believe that his fraud was minor and devoid of the reprehensibility meriting a punitive award, adopting that view would ultimately require the Court to reject the interpretation of the evidence adopted by the jury.  The jury found that Greenburg had shamelessly defrauded customers with "garbage."  Yet his conduct did not cause a particularly egregious harm:  he was dealing in luxury goods marketed to a sophisticated and wealthy subset of the population.  The harm was strictly economic, and the victims were far from vulnerable consumers.  These facts merit a relatively low award of punitive damages.  However, given Greenberg's wealth and the context of the high-end auctions at issue, a punitive damages award less than or equal to the compensatory amount in this case would be insufficient to punish Greenberg and deter other fraudsters considering following in his footsteps.

The Court ultimately concludes that punitive damages in an amount greater than two times compensatory damages would be so exorbitant as to be actuated by passion, and therefore excessive under New York law.  Accordingly, the Court will remit the punitive damages award to $711,622 (twice the compensatory damages award of $355,811).[20]  If Koch does not accept the reduced punitive damages award of $711,622, a new trial on punitive damages will be held. *See Vasbinder v. Scott*, 976 F.2d 118, 122 (2d Cir. 1992) ("[A] court may not simply reduce an award of punitive damages, but must offer the plaintiff the option of a new trial on that issue.").

---

[20] Although the compensatory damages award is being reduced to $212,699 as a result of Koch's settlement with Zachys by operation of NY GOL § 15-108, the Court still considers it appropriate to use the $355,811 figure as a measure of the harm for purposes of punitive damages.  Punitive damages were awarded on the fraud claim, a claim that was pending only against Greenberg at the time of the Zachys settlement.  It is also worth noting that the jury allocated 100% liability to Greenberg (and 0% to Zachys) on the GBL § 349 claim.

**VI.     Plaintiff's Motion for Attorney's Fees and Injunctive Relief**

As a result of the jury's liability finding, Koch has moved for the following post-trial

relief: (1) attorney's fees as a prevailing plaintiff under GBL §§ 349 and 350; (2) permanent

injunctive relief against Greenberg; and (3) prejudgment interest on all compensatory damages;

post-verdict/pre-judgment interest on all compensatory and punitive damages; and postjudgment

interest on the entire award.

**A.     Attorney's Fees**

Koch seeks an award of $7,865,872 in attorney's fees.  (Plaintiff's Post-Trial Motion for

Injunctive Relief, Attorneys' Fees, and Pre- and Post- Judgment Interest ("Pl.'s Mem."), at 8.)  In

response, Greenberg contends that "Koch's demand for nearly $8 million in attorneys' fees under

the GBL is plainly excessive in light of the jury's compensatory damages award of only

$355,811."  (Defendant's Memorandum of Law in Opposition to Koch's Post-Trial Motion, Dkt.

No. 504 ("Pl.'s Opp.") at 15.

Sections 349(h) and 350-e of the GBL provide that the court "may award reasonable

attorney's fees to a prevailing plaintiff."  As reflected in the statute's use of the word "may," the

"fee award [under § 349] is left to the discretion of the trial court in all circumstances."  *Riordan*

*v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 54 (2d Cir. 1992); *see also Independent Living*

*Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 131 (E.D.N.Y. 1998) (the "awarding of fees

under these sections remains in the sole discretion of the court"); *Berkshire Fashions, Inc. v.*

*Sara Lee Corp.* 729 F. Supp. 21, 23 (S.D.N.Y. 1990) ("no adequate showing has been made . . .

that justice and equity require an award of attorneys' fees in this case").

After careful consideration, the Court declines to award attorney's fees in this case. Although Koch is certainly a "prevailing plaintiff" under GBL §§ 349(h) and 350-e, a fee award is not warranted here for a number of reasons.

First, the attorney's fees incurred in this case—by extraordinarily talented trial lawyers on both sides—bore no relationship to the amount of actual damages at issue. The legal teams in this case have aggressively fought a battle royale for six years, incurring millions of dollars in fees on each side.[21] Yet the compensatory damages ultimately sought and awarded were only $355,811. In terms of the attorney's fees incurred, the case was litigated in a manner more typical of a nine-figure case than a six-figure case.

Second, this is not a case in which the compensatory damages fail to "capture the extent of the plaintiff's success at trial," such as where "the intangible value of the rights vindicated [is] far greater than the actual physical injuries sustained." *Wilson v. Car Land Diagnostics Ctr., Inc.*, No. 99 Civ. 9570, 2001 WL 1491280, at *2 (S.D.N.Y. Nov. 26, 2001) (Lynch, J.). As Judge Lynch has noted, GBL §§ 349 and 350 protect consumer rights, which, in commercial cases, "are directly measured by the financial damages imposed." *Id.*

Third, the purposes of the GBL statute do not ultimately support an award of fees under the circumstances of this case. This was fundamentally a fraud case: the fraud claim was the focus of the trial; and the availability of punitive damages on the fraud claim prevented the case from being rendered moot by Greenberg's refund offers. (*See* Dkt. No. 37, at 5-12.) But it is

---

[21] The docket in this case reflects 507 docket entries and appearances filed by a total of 36 attorneys (many of whom have come and gone). As the docket shows, the parties have aggressively litigated this case, filing numerous discovery motions, sanctions motions, and dispositive motions. The parties filed 22 motions in limine prior to trial and numerous letter motions throughout the trial.

only the GBL claims, not the fraud claim, that provide for potential fee-shifting.  To be sure, this

Court has held that Greenberg's conduct was sufficiently "consumer-oriented" to come within

the scope of the GBL provisions.  (*See* Dkt. No. 335, at 14-15.)  At the same time, however, this

case is not within the heartland of the types of cases animating the fee-shifting provisions of the

GBL, for two reasons:  (1) it does not involve consumers who are "vulnerable" or

"disadvantaged," and (2) it does not involve conduct with a "broad impact on consumers at

large."  *Independent Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 132 (E.D.N.Y.

1998) ("In awarding fees, the Court also considers that the purpose of [GBL §§ 349 and 350] . . .

was to combat 'fraud against consumers, particularly the disadvantaged.'"); *Devlin v. 645 First*

*Ave. Manhattan Co.*, 229 A.D.2d 343, 344, 645 N.Y.S.2d 476, 478 (1st Dep't 1996) (GBL claim

for attorney's fees "would not lie in this case because the requisite broad impact on consumers at

large is not evident" where harm was limited to residents of a condominium).

      Finally, it is relevant that Koch refused Greenberg's offers of a full refund for the bottles

of wine at issue.  It was Koch's choice to decline the refund offers and bring this case to trial, in

the hopes of sending a message and exposing what he perceived as Greenberg's wrongdoing.[22]

In the wake of trial, Koch has now succeeded in doing exactly that.  The Court does not in any

---

[22] On cross-examination, Koch engaged in the following colloquy with Greenberg's counsel
when discussing the refund offers:

> A. I could have [accepted the refund offers], but I sensed in his
> letters that he didn't accept any of the claims that we were
> claiming or any responsibility for selling fake wines.

> Q. You felt that he didn't confess to you?

> A. He didn't admit it.

(Tr. at 2429:15-19.)

way question or denigrate the intentions of Mr. Koch, who clearly feels strongly about this subject and is willing to expend significant resources on it.  But there is a real sense, reinforced by the amount of attorney's fees and Koch's rejection of the refund offers, in which this was a litigation of choice and of principle, rather than of necessity or monetary recompense.[23]

Accordingly, Koch's motion for attorney's fees under the GBL statute is denied.

### B.    Injunctive Relief

In addition to attorney's fees, Koch seeks injunctive relief against Greenberg, permanently enjoining Greenberg from the following: (1) engaging in deceptive acts or practices in selling his wines; (2) selling, offering, or consigning inauthentic wine; (3) selling, offering, or consigning wine without disclosing to buyers that he is the consigner of the wine; (4) selling, offering, or consigning wine without disclosing to buyers, auction houses, or retailers questions, doubts, or concerns expressed by others in the wine industry concerning the authenticity of the wine; (5) selling, offering, or consigning wine without disclosing to buyers, auction houses, and retailers that another auction house has previously rejected that wine for sale; (6) selling, offering, or consigning wine without first disclosing to buyers, auction houses, or retailers the provenance of the bottle being sold; (7) selling, offering, or consigning wine of a value at or above $500 without hiring an expert to inspect and authenticate the wine first; (8) engaging in false, deceptive, or misleading advertising; and (9) permitting an advertisement involving the

---

[23] Koch emphasizes that neither his wealth nor his sophistication bars an award of attorney's fees.  (Reply Memorandum of Law in Support of Plaintiff William I. Koch's Post-Trial Motion, Dkt. No. 507 ("Pl.'s Rep."), at 507.)  The Court agrees.  Moreover, the Court made clear over the course of this trial that any attempt by Greenberg to portray Koch as litigious would be foreclosed as inappropriate.  Nor does the fact that Koch is a knowledgeable buyer diminish his status as a victim of fraud.  Nevertheless, the Court finds it relevant to the attorney's fee analysis—and to a broader perspective on the litigation—that Koch could have been compensated years earlier for his injury and chose to spare no expense in this litigation, where the amount in controversy was miniscule in comparison to the attorney's fees involved.

sale of his wine to be published without disclosing that he is the consigner, any questions, doubts, or concerns raised by others in the wine industry about the authenticity of the wine, and the provenance of the wine.  (Pl.'s Mem. at 2.)

GBL §§ 349 and 350 allow private plaintiffs to bring actions to enjoin the unlawful practices proscribed by the statute.  In his Amended Complaint, Koch requested injunctive relief pursuant to the statute.  (Amended Complaint, Dkt. No. 285 ("Compl."), at ¶¶ 93, 100.)

### 1.    Legal Standard

The parties disagree as to the proper legal standard for injunctive relief under the GBL. According to Koch, "[t]o obtain an injunction under G.B.L. § 349, plaintiffs need only show that the defendants engaged in 'deceptive acts or practices,' as defined under the statute." *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 274 (S.D.N.Y. 2012).  Accordingly, Koch contends, courts examining the propriety of injunctive relief under the GBL will not apply the "standard [] injunction test," and instead will "look to the 'statutory conditions for injunctive relief,' and may issue a preliminary injunction if those conditions are met." *Id.* (quotations and citations omitted).  To be sure, the GBL, in part, "was written in order to give consumers 'the power to obtain injunctions against any and all deceptive and fraudulent practices.'" *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 (CM), 2011 WL 2119725, at *4 (S.D.N.Y. May 24, 2011) (quoting *Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank NA*, 85 N.Y.2d 20, 25 (1995)).  However, it is not clear from precedent whether a private plaintiff seeking a permanent injunction under the GBL must also satisfy the standard criteria employed by federal courts before granting a permanent injunction.  *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 391 (2006) (citations omitted).[24]  And while the *Barkley* case suggests that these traditional

principles of equity have no place when examining the propriety of injunctions sought by private

plaintiffs pursuant to the GBL, other cases cited by Koch suggest that while government entities

need not meet the traditional equitable requirements in seeking injunctions, private plaintiffs are

ordinarily afforded no such dispensation.  *See, e.g.*, *SEC v. Management Dynamics, Inc.*, 515

F.2d 801, 808 (1975) ("Accordingly, appellants' contention on this point stands or falls with its

claim that preliminary injunctions cannot be granted at the SEC's behest unless a district court

finds irreparable injury or a balance of equities which favors the Commission.  The appellants'

crucial error on this score is their assumption that SEC enforcement actions seeking injunctions

are governed by criteria identical to those which apply in private injunction suits.").[25]  Moreover,

federal courts in other contexts, even where the injunctive relief sought is authorized by statute,

have declined to issue such equitable relief automatically upon a liability finding, instead

---

[24] In the *eBay* case, the Supreme Court explained:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

[25] *See also People ex rel. Spitzer v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 805 N.Y.S.2d 175, 177 (2005) (holding that, in claim for injunction, "[a]s to the claims alleging deceptive business practices . . . under [GBL§ 349], the Attorney General was required to establish that respondents engaged 'in an act or practice that is deceptive or misleading in a material way and that [the consumer] has been injured by reason thereof'"); *People ex rel. Spitzer v. Gen. Elec. Co., Inc.*, 302 A.D.2d 314, 756 N.Y.S.2d 520, 523 (2003) (analyzing action for injunctive relief brought by the Attorney General without engaging in irreparable harm or *eBay* analysis).

choosing to engage in further inquiry.  *See, e.g.*, *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, No. 08 Civ. 8718 (SHS), 2013 WL 1242374, at *2 (S.D.N.Y. Mar. 28, 2013) (noting that while "Section 34 of the Lanham Act specifically authorizes district courts to enter injunctive relief in false advertising cases," nevertheless "a permanent injunction will only issue if a plaintiff has met the U.S. Supreme Court's four-factor test spelled out in [*eBay*]").  In response, Koch notes that the GBL explicitly authorizes private plaintiffs to seek injunctive relief, and as such, exempts them from the *eBay* criteria.  *See Management Dynamics*, 515 F.2d at 808 ("Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are 'creatures of statute.'").

To be sure, New York has clearly created a cause of action for citizens to act as private attorneys general in enforcing the consumer protection ideals embodied in the GBL.  However, as seen with courts' approach to the Lanham Act, a statutory cause of action for injunctive relief does not automatically release a plaintiff from the burdens of *eBay*, nor can it strip the Court of its obligations in equity.  *See, e.g.*, *Del Monte*, 2013 WL 1242374, at *2.  Moreover, a strict application of the rule proposed by Plaintiff would engender an absurd result:  permitting automatic injunctive relief, unlimited in scope, for any prevailing plaintiff on a GBL claim, no matter how small the violation.  Even the court in *Barkley* seemingly contemplated some criteria for limiting or analyzing the proper scope of injunctive relief sought pursuant to the GBL, citing *United States v. Broccolo*, No. 06 Civ. 2812, 2006 WL 3690648 (S.D.N.Y. Dec. 13, 2006), which held that "[w]hen an injunction is expressly authorized by statute, the standard preliminary injunction test is not applied.  Instead, the Court must look to the 'statutory conditions for injunctive relief,' and may issue a preliminary injunction if those conditions are met."  *Id.* at *1.  Here, however, there are no "statutory conditions for injunctive relief," but merely an

authorization for private plaintiffs to bring suits in equity and at law for violations of the GBL; accordingly, "traditional equitable considerations must be applied." *Id.* at *2. In employing this approach, other courts have recognized its consistency with Supreme Court precedent "strongly disfavor[ing]" a presumption of irreparable harm and, consequently, the automatic legitimacy of injunctive relief upon a finding of liability. *See, e.g.*, *Kane v. Chobani, Inc.*, No. 12 Civ. 02425, 2013 WL 3776172, at *7 (N.D. Cal. July 15, 2013) ("The Court distills from these cases, that presumptions and categorical rules regarding irreparable harm are strongly disfavored, and that a preliminary injunction should generally only issue upon a finding of a likelihood of irreparable harm. To the extent that presumptions are permissible, they may only be employed upon a showing that Congress clearly intended for a presumption to apply." (citations omitted)).

Here, a private litigant seeks permanent injunctive relief pursuant to the GBL. While the GBL provides a statutory basis for him to do so, as discussed above, this statutory right of action does not vitiate the need to satisfy the factors outlined in *eBay*. Koch's status as a private attorney general will not relieve him of the traditional burdens of a plaintiff in equity. *See, e.g.*, *Verzani v. Costco Wholesale Corp.*, 387 Fed. App'x 50, 51-53 (2d Cir. 2010). Were the GBL to include specific statutory conditions under which an injunction is properly granted, the statutory framework would prevail. *See, e.g.*, *Broccolo*, 2006 WL 3690648, at *1-2. In light of the Supreme Court's teachings on presumptions of equitable relief, it cannot be that a prevailing plaintiff under the GBL will automatically receive a permanent injunction, unlimited in scope so long as that plaintiff had the foresight to pray for injunctive relief in its original complaint. *See Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 429-30 (E.D.N.Y. 2004) (denying final injunction in Lanham Act and GBL case).

54

### 2.    Application of Law to Facts

The Court examines Koch's proposed permanent injunction under the four factors delineated in *eBay*, finding that such an injunction is unwarranted in this case.[26]  First, Koch has not suffered irreparable injury.  His injury was fully reparable by compensation for the counterfeit bottles.  And while Koch asserts that the 24 bottles at trial were not the full extent of the counterfeits consigned by Greenberg, such a contention is beyond the injury proven at trial and thus not properly the subject of a permanent injunction.  Moreover, Koch could have received a full refund for these bottles, and still others, had he accepted Greenberg's refund offers in the years prior.

Second, the remedies available at law for the injury suffered here—monetary damages, both compensatory and exemplary—are adequate to make Koch whole.  Here, Koch has received the value of the counterfeit wine consigned by Greenberg, as well as $24,000 in statutory damages under the GBL.  Nor will Koch continuously suffer as a result of Greenberg's violations, as he has been paid in full.

Third, in considering the balance of the hardships between Koch and Greenberg, it is clear that the terms of the injunction would require Greenberg to make disclosures not required of other consigners in the wine industry, due to his actions associated with the 2005 Zachys auction that was the sole subject of this case.  That result is unwarranted.  Koch has made efforts

---

[26] Independently, even if *eBay* were not the appropriate metric, under traditional principles of equity, the injunction sought by Koch could not stand, as it is overbroad and excessive in light of the litigation.  For example, while Koch seeks to enjoin Greenberg from "permitting an advertisement involving the sale of his wine to be published without disclosing . . . questions, doubts, or concerns raised by others in the wine industry about the authenticity of the wine," there is no discussion of what might constitute such "doubts" or "concerns."  *See Mgmt. Dynamics*, 515 F.2d at 807-08 (even when awarding an injunction authorized by statute, which "obviates" the need for a finding of "irreparable injury," a court must "implicitly" examine "those considerations of fairness that have been the traditional concern of equity courts").

to change the auction practices in the industry that permit this type of deceit to occur.  However, it does not follow from the jury's finding that Greenberg engaged in GBL violations that he must now be the symbol for changed norms within the wine industry.  An injunction permanently compelling Greenberg to speak about "questions, doubts, or concerns" regarding his wine, and indefinitely requiring him to hire his own expert to authenticate wine before consigning it, regardless of the auction house's own requirements, is beyond the pale.  Finally, the Court concludes that the overall public interest would not be served by the injunction sought by Koch.

While it is true that federal courts have "broad power to restrain acts which are of the same type or class as unlawful acts which [have been] found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past," *NLRB v. Express Pub. Co.*, 312 U.S. 425, 435 (1941), the Court is satisfied that this costly litigation, intense public scrutiny, and a punitive damages award are sufficient to dissuade Greenberg from engaging in deceptive acts or practices in the future.

Accordingly, Koch's request for a permanent injunction is denied.

## C.   Interest

Finally, Koch seeks (1) pre-judgment interest on his compensatory damages, pursuant to New York CPLR § 5001; (2) post-verdict and pre-judgment interest on his compensatory damages and punitive damages pursuant to CPLR § 5002; and (3) post-judgment interest pursuant to 28 U.S.C. § 1961.

### 1.      Pre-Judgment Interest on Compensatory Damages

Section 5001 provides that mandatory pre-judgment interest "shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . . ."

56

CPLR § 5001(a). Pre-judgment interest, which is fixed at the statutory rate of 9%, *id.* § 5004, accrues from the "earliest ascertainable date the cause of action existed," *id.* at § 5001(b). Both parties agree that pre-judgment interest should accrue from no later than February 15, 2006, the date on which Koch received shipment of the 24 wines at issue in this lawsuit. However, they disagree as to the endpoint of the interest accrual, with Koch contending that it should accrue until the date that judgment is entered by the Court and Greenberg asserting that his refund offers affect the accrual period's length.

Under New York law, "one of the principal purposes of allowing prejudgment interest is to compensate the plaintiff for its inability to use the money." *Quintel Corp., N.V. v. Citibank, N.A.*, 606 F. Supp. 898, 914-15 (S.D.N.Y. 1985). Accordingly, where putative plaintiffs receive, but refuse, a tender offer of the money at issue in the eventual suit, courts have recognized that defendants "should not be penalized for [such a plaintiff's] refusal of the tender." *Id.* at 915; *see also Rivera v. Cincinnati Inc.*, No. 92 Civ. 4345 (SHS), 1998 WL 898128 (S.D.N.Y. Dec. 23, 1998) ("The accrual of interest is halted by either tendering a deposit to the clerk of court in an amount sufficient to satisfy the claim or by tendering unconditional payment to the plaintiff." (citations omitted)); *Feldman v. Brodsky*, 12 A.D.2d 347, 350, 211 N.Y.S.2d 56, 59 (1961), *aff'd*, 11 N.Y.2d 692, 180 N.E.2d 915 (1962) ("One [way in which a judgment holder may be estopped from enforcing statutory prejudgment interest] is by a tender from the judgment debtor which does not result in a satisfaction of the judgment because the judgment creditor refuses it[.]"). This interpretation of the law stems from familiar equitable considerations rooted in estoppel. *See Knab Bros., Inc. v. Town of Lewiston*, 58 A.D.2d 1016, 397 N.Y.S.2d 45 (4th Dep't 1977) ("Concededly, the right to interest may be lost on equitable principles of estoppel, such as a refusal by a creditor to accept a tender." (citations omitted)). In order, however, "to be valid as a

defense against the accrual of interest running against the debtor, a tender must be shown to be absolute and free from all conditions." *Id.* (citation omitted); *see also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 770 F. Supp. 1014, 1021 (E.D. Pa. 1991) (applying NY law, noting that a tender must be free of conditions to act as an estoppels against prejudgment interest); *Malson Ltd. v. Liberty Mut. Fire Ins. Co.*, No. 84 Civ. 1717 (CMM), 1986 WL 2963, at *1 (S.D.N.Y. Mar. 3, 1986) (same). Thus, a tender conditioned on, for example, release of a lawsuit's claims, would not act as a bar to prejudgment interest.

Here, Greenberg's position throughout this litigation has been that the refund offers were not settlement offers in the traditional sense, as they were not explicitly conditioned on a release of the claims in the litigation. As discussed above, the Court eventually agreed with this view, and thus held that the offers did not fall within the traditional strictures of Federal Rule of Evidence 408. While Koch's position has been that the offers were settlement offers, and thus conditional, Koch also argued (successfully) that a payment of compensatory damages would not moot this case, given the request for punitive damages. Accordingly, an acceptance of these refund tenders would neither have explicitly, nor implicitly, barred Koch's ability to bring the claims central to this lawsuit; and as such, the refund offers cannot reasonably be construed as conditional. Therefore, with respect to seven of the bottles ultimately included in the jury's verdict,[27] the pre-judgment interest shall accrue from February 15, 2006 through November 27, 2007, the date of Greenberg's first refund offer. With respect to the remaining 17 bottles, the

---

[27] The following bottles were the subject of Greenberg's initial refund offer: (1) the 1921 Chateau Lafleur (Trial Ex. 206); (2) the three 1945 Chateau Lafleur (Trial Exs. 207, 229, 230); (3) the 1928 Chateau Latour (Trial Ex. 200); (3) the 1921 Chateau Petrus (Trial Ex. 225); and (4) the 1928 Chateau Petrus (Trial Ex. 216).

pre-judgment interest shall accrue from February 15, 2006 through November 29, 2010, the date of Greenberg's second refund offer.

### 2.    Post-Verdict, Pre-Judgment Interest on Award

Koch also seeks statutory pre-judgment interest, pursuant to CPLR § 5002 on the entire award, from the date the jury entered the verdicts to the date of the final judgment of the Court. CPLR § 5002 provides that "[i]nterest shall be recovered upon the total sum awarded, including interest to verdict, report or decision, in any action, from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment."  Again, the interest rate is the statutory percentage of 9%, and includes pre-judgment interest to date on the verdict amount. *Del Monte*, 2013 WL 1242374, at *10 ("In other words, pursuant to section 5001, the Court will add 9% interest from the date the damages were incurred to the date of verdict; pursuant to section 5002, the Clerk of Court will add to the judgment 9% interest from the date of verdict to the date of judgment on the sum of (1) the contract damages and (2) the section 5001 interest."). As § 5002 directs that the post-verdict, pre-judgment interest include the interest to verdict (the § 5001 interest discussed above), here, Koch will receive 9% interest on the relevant amounts, which will accrue from the date of the liability verdict (April 11, 2013), until the date the Court enters a final judgment.  Under the plain language of § 5002, Koch is also entitled to post-verdict, pre-judgment interest on his punitive damages award, from the date of that verdict (April 12, 2013), until the date the Court enters its final judgment.  The pre-judgment interest on Koch's punitive damages award will accrue on the remitted amount of $711,622, rather than on the full amount of $12,000,000.  *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 56 (2d Cir. 1998).

### 3.     Post-Judgment Interest on Award

Title 28 U.S.C. § 1961 entitles prevailing plaintiffs to post-judgment interest "on any money judgment in a civil case recovered in a district court." *Id.* at § 1961(a). This interest rate is calculated from the date of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment," up "to the date of payment . . . ." *Id.* at § 1961(a)-(b). "Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *Andrulonis v. United States*, 26 F.3d 1224, 1230 (2d Cir. 1994). The postjudgment amount upon which the interest accrues includes compensatory damages, punitive damages, and fee awards. *See Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08 Civ.10283 (PAC) (KNF), 2009 WL 2611950, at *11 (S.D.N.Y. Aug. 18, 2009), *report and recommendation adopted sub nom. Becerril v. Ease Bronx NAACP Child Develpoment Ctr.*, No. 08 CIV. 10283 (PAC) (KNF), 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009); *accord Foley v. City of Lowell, Mass.*, 948 F.2d 10, 21-22 (1st Cir. 1991) ("[W]e hold that, once a money judgment is obtained in a federal district court, interest thereon is obligatory under 28 U.S.C. § 1961 without regard to the elements of which that judgment is composed, even if attorneys' fees are included." (footnote omitted)).

## VII.    Conclusion

For the foregoing reasons, it is hereby ORDERED that:

1.     Defendant's motion for judgment as a matter of law, or, in the alternative, for a new trial, is GRANTED in part and DENIED in part, as follows:

       (a)      the compensatory damages award is reduced pursuant to New York General Obligations Law § 15-108 from $355,811 to $212,699 as a result of Plaintiff's prior settlement with Zachys;

       (b)      the punitive damages award of $12 million is remitted to $711,622; if Plaintiff does not accept the remitted punitive damages amount, a new trial on punitive damages will be held;

       (c)      in all other respects, Defendant's motion for judgment as a matter of law or for a new trial is DENIED;

2.     Plaintiff's motion for attorney's fees, injunctive relief, and interest is GRANTED in part and DENIED in part, as follows:

       (a)      Plaintiff's request for attorney's fees is DENIED;

       (b)      Plaintiff's request for injunctive relief is DENIED;

       (c)      Plaintiff request for pre- and post-judgment interest is GRANTED.

3.     Plaintiff shall inform the Court by letter, on or before April 25, 2014, whether he accepts the remitted amount of punitive damages.  If he does so, an appropriate order directing entry of final judgment will be issued.

The Clerk of Court is directed to close the motions at docket entry numbers 495 and 497.

SO ORDERED.

Dated: March 31, 2014
New York, New York

_____

J. PAUL OETKEN
United States District Judge

61